Milk Control Board,
Nos. 5429, 5489, 5491.

NEW HAMPSHIRE MILK DEALERS' ASSOCIATION

*v.*

NEW HAMPSHIRE MILK CONTROL BOARD.

GRANITE STATE DAIRYMEN'S ASSOCIATION & *a.*

*v.*

NEW HAMPSHIRE MILK CONTROL BOARD.

Argued June 8, 1966.
Decided August 31, 1966.

*Booth, Wadleigh, Langdell, Starr & Peters* ( *Mr. Philip G. Peters* orally ), for New Hampshire Milk Dealers' Association.

*Tiffany & Osborne* ( *Mr. Gordon M. Tiffany* orally ), for Granite State Dairymen's Association.

*Hardy, Hall, Grimes & Murphy* ( of Massachusetts ) ( *Mr. Reuben Hall* orally ), for New England Milk Producers' Association.

*George S. Pappagianis,* Attorney General and *R. Peter Shapiro,* Assistant Attorney General ( *Mr. Shapiro* orally ), for New Hampshire Milk Control Board.

*Robert F. McNeil* ( of Massachusetts ) and *Daniel E. Donovan, Jr.* ( *Mr. McNeil* orally ), for Cumberland Farms Northern, Inc., as amicus curiae.

LAMPRON, J. On September 7, 1965, after a public hearing, the

Board found "that in order to protect the public health from impairment by a shortage of milk of proper quality, it is necessary to increase the cost of milk paid to producers." It also found "that it is not necessary to increase the minimum retail price of milk" and made orders accordingly. After denial of their motions for rehearing, the plaintiffs appealed to this court on the grounds that the decisions and orders of the Board were not supported by the evidence, were contrary thereto and to law, and were unfair, arbitrary and discriminatory.

On February 4, 1966, after public hearings on December 28 and 29, 1965, a majority of the Board made many findings among which was the following: "11. Removal of price controls is in the public interest." It then ruled that effective April 4, 1966 "price controls on both the retail and producer levels are eliminated." This court suspended that order on certain conditions pending disposition of this appeal. *New Hampshire Milk Dealers' Ass'n* v. *N. H. Milk Control Board*, 107 N. H. 150.

Because these orders of the Board superseded those of September 7, 1965, the plaintiffs' arguments on their appeals from both of these decisions have been focused on that of February 4, 1966. Their appeals from the latter are based on the grounds, among others, that the Board's refusal to disqualify its chairman, William H. Craig, prior to the hearing, as requested by the plaintiffs, was contrary to law and the evidence; that the Board erred in its admission and consideration of certain evidence; that its findings, rulings and orders are, without support in the evidence and contrary thereto, against the weight of the evidence, contrary to law, unfair, unreasonable, arbitrary and discriminatory.

We consider first the contention that the plaintiffs were denied a fair and impartial hearing as required under the due process clause of the Fourteenth Amendment of the Federal Constitution and Article 35th, Part I of our State Constitution. They argue that this denial of due process resulted because William H. Craig was biased "in that he had prejudged the issue for which he called a public hearing on December 28, 1965" and failed to disqualify himself from participation in the hearing and decision of the matters in controversy.

In an offer of proof on that issue made by counsel for the plaintiff Milk Dealers' Association, the following facts appeared. Craig, a member of the Democratic party, was minority floor

leader in the 1965 New Hampshire House of Representatives. At the request of the Governor's office, he co-sponsored a bill to eliminate the authority of the Milk Control Board to fix resale prices of milk. During the session he worked to get this bill, in which he believed honestly and genuinely, out of committee and on the floor of the House to do his utmost for its adoption. Counsel asked "From the time of the conclusion of the legislature [July 1, 1965] and the time at which Governor King appointed you as Chairman of the Board [August 1965] you had not, had you, changed your opinion on the necessity for resale controls?" Craig answered "I don't think I ever had any doubts on the wisdom of that bill until after I was appointed chairman of the Milk Control Board, so I guess the answer to your question is 'Yes.'"

The record also shows that in answer to a letter asking that he disqualify himself, Craig, a lawyer, wrote "I thought I could conduct the hearing fairly and impartially, and give a fair and impartial ruling to the best of my ability." He also testified that since his appointment to the Milk Control Board he had made no public statements with reference to the milk control bill previously mentioned or to the abolition of milk controls; that he sat during the hearings on December 28 and 29, 1965 with an open mind; that he would view the evidence as presented and abide by his oath of office to uphold the laws of the State of New Hampshire.

The record is devoid of any evidence that Craig had any personal pecuniary interest in the outcome of the matters before the Board. See *Opinion of the Justices,* 104 N. H. 261, 264. Nor is there any evidence that he labored under a personal ill-will toward any of the parties. See *Hawkins* v. *Grand Rapids,* 192 Mich. 276, 289; 1 Am. Jur. 2d, Administrative Law, *s.* 64, *p.* 861.

Since 1784, Article 35th, Part I of our Constitution has provided that "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." We subscribe to what was said in that respect by this court as far back as 1851 that it is an obvious principle of justice "that all persons who are to act as judges, should be impartial, without any interest of their own in the matter in controversy, and without any such connexion with the parties in interest, as would be likely, improperly, to influence their judgment." *Sanborn* v. *Fellows,* 22 N. H. 473, 481. There is no doubt that these principles apply to the members of the Milk Control Board acting in a quasi-judicial capacity as

they were in this case. *Tuftonboro* v. *Willard,* 89 N. H. 253, 261. However whether there exists in a case sufficient interest or bias to disqualify such a member depends upon its particular circumstances. *Matushefske* v. *Herlihy,* 214 A. 2d 883, 886 ( Del. 1965 ).

It is a well-established legal principle that a distinction must be made between a preconceived point of view about certain principles of law or a predisposed view about the public or economic policies which should be controlling and a prejudgment concerning issues of fact in a particular case. 2 Davis, Administrative Law Treatise, *s.* 12.01, *p.* 131. There is no doubt that the latter would constitute a cause for disqualification. However "bias in the sense of crystallized point of view about issues of law or policy is almost universally deemed no ground for disqualification." *Id.*; *Moses* v. *Julian,* 45 N. H. 52, 55; *Tuftonboro* v. *Willard,* 89 N. H. 253, 261; *Federal Trade Com.* v. *Cement Institute,* 333 U. S. 683, 701; *United States* v. *Morgan,* 313 U. S. 409, 421; 1 Am. Jur. 2d, Administrative Law, *s.* 65, *p.* 862. If this were not the law, Justices *Holmes* and *Brandeis* would have been disqualified as would be others from sitting on cases involving issues of law or policy on which they had previously manifested strong diverging views from the holdings of a majority of the members of their respective courts. 2 Davis, Administrative Law Treatise, *s.* 12.01, *p.* 132. Decisions of judges on certain questions of law and policy may reflect the economic and social philosophy of the times. Holmes, The Path of Law, 10 Harv. L. Rev. 457, 466; Cardozo, The Nature of the Judicial Process 173. This detracts in no way from the requirement that a judge or board member must not have a bias or prejudgment concerning issues of fact in a particular controversy.

The record in this case warranted a finding by the Board that William H. Craig had no pecuniary interest in this case, that he entertained no ill will or prejudice toward any of the parties, and that he had no bias or prejudgment concerning the issues of fact involved nor as to the outcome of the hearings. The record surely does not demand a ruling by this court that he was disqualified as a matter of law and that his participation in these hearings and the decision constituted a violation of the constitutional rights of the plaintiffs. *O'Brien* v. *Curran,* 106 N. H. 252, 258; *Opinion of the Justices,* 104 N. H. 261, 265.

The plaintiffs also contend that the Board erred when it received

in evidence and considered certain exhibits without giving them the opportunity to cross-examine their authors. They complain particularly about exhibits 1-5 introduced by the Chairman of the Board at the beginning of the hearing and a letter from Governor John W. King also introduced as an exhibit.

Exhibit 1 was an article in the spring issue of the Farm Quarterly (1965) dealing with a study made by Cornell University and information acquired from four New York State dairymen pertaining to per cow production, butterfat, and income over feed costs. Exhibit 2 was a study of "Market Structure, Competition and Regulation in the Distribution of Fluid Milk" prepared by "A Committee on Milk Marketing Appointed by Governor Nelson A. Rockefeller" (1964). Exhibit 3 was a reprint of an article in Illinois Agricultural Economics (Vol. 5 No. 2, July 1965) entitled "Milk Distribution Margins, Prices and Consumption: State Controlled Versus Competitive Markets." Exhibit 4 was entitled "A Study of The History, Administration and Operation of RSA 183 Relating To Milk Control" published by the Department of Economics of University of New Hampshire. Exhibit 5 was entitled "Plan For the Operation Of The Milk Sanitation Code January 1, 1966 — December 31, 1966" prepared by the Milk Sanitation Board (RSA 184:80-82).

It is not claimed by the plaintiffs that their introduction in evidence was in violation of the rules of procedure adopted by the Board sometime prior to the hearing. Many exhibits of a similar nature offered by the plaintiffs were admitted in evidence. Their objection is based on the ground that the authors of the exhibits presented by the Board were not available for cross-examination.

The law is well settled that administrative tribunals are not bound by the strict technical rules of evidence governing court proceedings, including the rule against admission of hearsay evidence, even though the administrative agency is acting in an adjudicatory or quasi-judicial capacity as was the Board in this case. *Goldsmith* v. *Kingsford,* 92 N. H. 442, 445; *In re Mundy,* 97 N. H. 239, 241; 2 Am. Jur. 2d, Administrative Law, *ss.* 344, 378, 382, *pp.* 158, 159, 183, 188. See *Taylor* v. *England,* 213 A. 2d 821, 824 (D. C. App. 1965); *National Lab. Rel. Bd.* v. *Donnelly Co.,* 330 U. S. 219, 236; *Hyson* v. *Montgomery County Council,* 217 A. 2d 578, 587 (Md. App. 1966).

These exhibits dealt mostly with general information pertaining

to the milk industry and constituted "the kind of evidence which responsible persons are accustomed to rely upon in serious affairs." *Goldsmith* v. *Kingsford, supra,* 444. Under the circumstances it was proper for the Board to admit in evidence without the presence of the author "what he has said on the matter, just as we do in every other concern of life." *Perry* v. *Parker,* 101 N. H. 295, 297. See *Gagnon* v. *Pronovost,* 97 N. H. 500, 503. We are of the opinion that the same considerations warranted the admission of the letter written by Governor King expressing his views on "state milk controls" in New Hampshire. Witnesses favorable to the point of view of the plaintiffs had the right to, and some did, testify concerning some of these exhibits during the hearing. We find no error in the procedure followed by the Board in admitting them in evidence.

We also hold that the Board could properly refuse in the exercise of its discretion to compel witness Haseotes to name the Vermont producers outside the State of New Hampshire from which the Massachusetts supplier of his milk at Portsmouth bought the milk and the price paid for it to these producers. 2 Am. Jur. 2d, Administrative Law, *s.* 424, *p.* 234. An examination of the record shows no violation of the rights of the plaintiffs in the procedure adopted and followed by the Board in the hearing.

We consider next the plaintiff's contentions that the order of the Board, dated February 4, 1966, removing all controls was illegal, unlawful, contrary to the substantial weight of the evidence, contrary to the facts, was capricious, arbitrary, unjust and unreasonable.

RSA 183:6 places on the Board the duty to assure to the public throughout the state a sufficient quantity of milk of a proper quality. *Cloutier* v. *State Milk Control Board,* 92 N. H. 199, 203. To that end the Board is authorized to fix the prices which distributors may pay producers and the prices which they may charge to consumers and others in order to assure an adequate supply in a specified market, when the loss of such supply may be a threat to the public. RSA 183:7; *Petition of Associated Grocers,* 103 N. H. 302, 303. In other words the Board's authority to fix such prices is bottomed on its determination "after public notice and hearing, that the public health is menaced, jeopardized, or likely to be impaired or deteriorated by the loss or substantial lessening of a supply of milk of proper quality in a

specified market." RSA 183:7. "Prices fixed by the Board are not permanent but may be changed when the public interest so demands." *Opinion of the Justices,* 88 N. H. 497, 499. It follows that the removal of controls over such prices must be based on a finding by the Board that the absence of such price controls will not produce a substantial lessening of an adequate supply of quality milk.

Proceeding on that basis the Board properly gave notice, on December 6, 1965, of a public hearing to be held December 28 next for the purpose of receiving evidence on among other topics: "Will the public health be menaced or jeopardized or is the public health likely to be impaired or deteriorated by the loss or substantial lessening of the supply of milk of proper quality in any market in the State of New Hampshire at this time in the absence of price control by the Milk Control Board?"

Plaintiffs' appeals from the resulting orders of the Board are governed by RSA 541:13 which provides as follows: "BURDEN OF PROOF. Upon the hearing [in the supreme court] the burden of proof shall be upon the party seeking to set aside any order or decision of the commission to show that the same is clearly unreasonable or unlawful, and all findings of the commission upon all questions of fact properly before it shall be deemed to be *prima facie* lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable."

The test, therefore, as to findings of fact is not whether on the evidence this court or some other tribunal would have reached a different result, or whether the Board could have reached an opposite result, but rather whether taking the evidence as a whole the Board could reasonably have found as it did. *Grafton etc. Co. v. State,* 77 N. H. 490, 493; *Cumberland Farms v. Pierce,* 104 N. H. 489, 497. See *Universal Camera Corp.* v. *National L. R. Bd.,* 340 U. S. 474, 488; *Clover Hill Seminary Club, Inc.* v. *Goldsboro,* 47 N. J. 25. In this determination numerical superiority of the witnesses on one side of the issue is not the criterion. 20 Am. Jur., Evidence, *s.* 1190, *p.* 1043. See *State* v. *Hodge,* 219 A. 2d 367, 371 ( Conn. 1966 ). " Nor should we require the Board to make a quantitative appraisal of the relevant factors." *National*

*Labor Relation Bd.* v. *Seven- Up Bottling Co.,*344 U. S. 344, 348.

The Board may rely on the appearance of a witness, his interest in the outcome, his knowledge, experience and training, the circumstances under which a document was prepared. *Gilliam* v. *Waltsons Corporation,* 105 N. H. 373, 377; 58 Am. Jur., Witnesses, *s.* 865, *pp.* 493, 494. "Triers of fact in our fact-finding tribunals are . . . free in the exercise of their honest judgment, to prefer the testimony of a single witness to that of many." *Weiler* v. *United States,* 323 U. S. 606, 608. Consequently the Board was at liberty to accept or reject such portions of the testimony or of exhibits as it saw fit. *Plymouth Fire District* v. *Water Pollution Comm'n,* 103 N. H. 169, 173. The burden is on the plaintiffs to satisfy this court that upon the evidence the findings of the Board were erroneous. *Grafton etc. Co.* v. *State,* 77 N. H. 490, 503.

The first three findings of the Board were as follows:

"1. That more than 57% of the milk consumed in this state comes from out of state sources and thus the producer price is not subject to orders issued by this Board.

"2. Approximately half of the producers in New Hampshire are not subject to the prices established by the Board because they ship into the so-called Boston Market Pool and are therefore subject to Federal regulation and to prices determined by the Federal Market Administration.

"3. Because of the above 2 factors, it is not feasible to control the quantity and quality of milk used in New Hampshire by virtue of the establishment of minimum prices."

The plaintiffs do not seriously dispute the factual basis for findings Nos. 1 and 2. They differ with the Board on the conclusions drawn from them in finding No. 3. However the fact that 57 per cent of the 214 million pounds of milk consumed by the non-farm population in this state in 1964 and 50 per cent of the 357 million pounds of milk produced by New Hampshire farmers in that year are impervious to price controls established by the Board warrants the Board's finding No. 3.

Findings Nos. 4, 5 and 6 are as follows:

"4. The Board relies primarily on the New Hampshire Division of Public Health to insure that milk of proper quality is available to the public.

"5. The Milk Sanitation Board has recently adopted rules and

regulations which will provide an adequate program of inspection to insure that milk offered to the consumers in this state is of a proper quality.

"6. The Milk Control Board finds that the Milk Sanitation Board can effectively safeguard the purity of milk and it is not necessary to fix minimum prices to insure milk of a proper quality."

RSA 183:6, 9 indicate a legislative intent that the Board was to operate in conjunction with the Division of Public Health a "Plan For The Operation Of the Milk Sanitation Code — January 1, 1966 — December 31, 1966" adopted in conformity with the requirements of RSA 184:79 — 102 was an exhibit in this case. It contained over four pages of milk "Laboratory Approval Program," "Product Sampling Program," "Plant Inspection" and "Milk Sanitation Surveys" to be conducted. We are of the opinion that these findings of the Board were warranted by the evidence especially where the record is devoid of any evidence of unwholesome milk in the state.

Findings Nos. 7, 8, and 9, were the following:

"7. Experience in States away from New England have tended to show that when price controls are eliminated, there has followed a temporary period of readjustment but these readjustments did not jeopardize the interests of the consumer.

"8. Removal of price controls in Massachusetts apparently did not cause any particular hardship to the milk industry as a whole, in that state, nor was the removal detrimental to the public.

"9. In States where there are no price controls, the consumers have an adequate supply of milk of a proper quality."

A milk dealer who operated in different jurisdictions, including Massachusetts, during price controls and after their removal testified that abolishment of price controls had no serious effect on the supply of quality milk or the industry as a whole. Another dealer testified that in a stabilized market after decontrol of prices the milk industry as a whole seemed to be better off. A witness with long years of experience in the food business testified that a lifting of price controls would prove beneficial to the consumer and to the milk industry as a whole. There was evidence that of the twenty-nine states which had adopted laws to control milk prices, fourteen of them had repealed their law. Although this was

a strongly contested issue, the Board could reasonably make the above findings.

Finding No. 10 is:

"The Board finds that any readjustment in the industry caused by the removal of price controls can be controlled, if necessary, by other methods. See RSA chapters 356 and 358 and also 183: RSA 6 & 9."

RSA ch. 356 regulates unlawful combinations and monopolies in trade and commerce. There was testimony that these trusts were one of the dangers which might result from decontrol of milk prices. RSA ch. 358 is an "Unfair Sales Act" which along with RSA ch. 356 could be found by the Board capable of controlling any readjustment in the milk industry on the abolishment of price controls. RSA 183:6; *Cloutier* v. *State Milk Control Board,* 92 N. H. 199, 204.

Finding No. 11 "Removal of price controls is in the public interest," is a finding essential to the Board's decision. It is not an indication that the Board is endeavoring to usurp the powers of the Legislature, as contended, but rather, a distillate of its previous findings and an answer to the first question on the call of the hearing, that is, that the public health will not be menaced or impaired by the removal of price controls on milk in this state at the present time. In declaring this law constitutional, this court stated "the power of the Board to establish prices is dependent on the prevalence of an economic condition injurious to public health in a definite marketing area, and the existence of this condition in such area must first be found as a fact . . . the prices fixed by the Board are not permanent but may be changed when the public interest so demands." *Opinion of the Justices,* 88 N. H. 497, 499.

There was evidence that the adoption of statutes controlling prices of milk was occasioned by the economic situation of the 1930's with its effect on the milk industry. There was evidence which would warrant a finding that the present modes of refrigeration, sanitation and transportation, and other modifications in the milk industry have changed the requirements for an adequate supply of milk of a proper quantity and quality in the state. It is also undisputed that a large percentage of the milk produced and consumed in New Hampshire is unaffected by price controls.

There was evidence of the great progress made in the control of diseases in milk herds. The wholesomeness of the milk produced and consumed in this state could be found attributable to controls exercised by the health authorities rather than resulting materially from price controls. The Board could also find that disturbances in the milk industry which have followed decontrol in other states could be moderated or probably held in check by present laws against unlawful combinations and pricing practices. RSA chs. 356, 358.

On the evidence the Board could reasonably find that the milk market would probably stabilize in a relatively short period after the removal of controls and that the milk industry and the public generally would be benefited by the free competitive economy. There was evidence that in spite of the decrease in the number of producers over the years milk was being produced in as great a quantity as formerly. The Board could also find that the removal of all controls will probably enable the local producers to maintain their present markets, permit the distributors to operate effectively to the advantage of the consumer.

On the findings of the Board, which were warranted by the evidence, that an adequate supply of milk of proper quality would be maintained in New Hampshire at the present time without the fixing of prices we cannot say that the order of the Board eliminating controls on both the retail and producer levels was unjust or unreasonable. *Cumberland Farms* v. *Pierce,* 104 N. H. 489, 496.

The decontrol order of the Board also contained the following: "The Board further issues stern warning to all concerned that unfair and unlawful trade practices in the industry will not be tolerated and the Board will take all precautions to see that there are no violations of RSA chapters 356 and 358. The Board further determines that prices paid to producers that are below the blend price as determined by the Massachusetts and Rhode Island Milk Market Administrator shall be prima facie evidence of violation of 183 RSA 6 and the Board will take immediate action to revoke or suspend licenses of any licensees engaged in such a transaction."

As part of its duties of assuring an adequate supply of milk of proper quantity and quality in the state, "the board shall secure the cooperation of those engaged in the industry to maintain fair

and lawful trade practices." RSA 183:6. The Board's warning merely emphasized its determination to perform its statutory duty to maintain fair and lawful practices in the milk industry operating in New Hampshire. This was proper. *Cloutier* v. *State Milk Control Board,* 92 N. H. 199, 205.

In order to make more specific its determination to secure maintenance of fair and lawful practices, the Board used a norm with which the record is replete, and which is used in the industry, the Massachusetts and Rhode Island Milk Market Orders. As the Board cannot suspend or revoke a license except upon proper evidence after due notice and public hearing, this action by the Board was not improper and does not violate any rights of the plaintiffs.

*Appeals dismissed.*

All concurred.