Public Utilities Commission
No. 84-402

APPEAL OF SEACOAST ANTI–POLLUTION LEAGUE
(New Hampshire Public Utilities Commission)

September 7, 1984

*Backus, Shea & Meyer*, of Manchester (*Robert A. Backus* on the brief and orally), for the Seacoast Anti-Pollution League.

*Sulloway, Hollis & Soden*, of Concord (*Martin L. Gross* on the brief and orally), for Public Service Company of New Hampshire.

*Michael W. Holmes*, of Concord, by brief and orally, as Consumer Advocate.

*Douglas I. Foy* and *Armond M. Cohen*, of Boston, Massachusetts (*Mr. Foy* and *Mr. Cohen* on the brief, and *Mr. Foy* orally), for the Conservation Law Foundation of New England, Inc.

*Gregory H. Smith*, attorney general, and *Larry M. Smukler*, of Concord (*Bruce E. Mohl*, assistant attorney general, and *Mr. Smukler* on the brief, and *Mr. Mohl* orally), for the State, as amicus curiae.

*Law Offices of Michael B. King*, of Hanover, by brief for Chris Spirou, as amicus curiae.

PER CURIAM. This case arises out of a petition by Public Service Company of New Hampshire (PSNH) filed with the public utilities commission (PUC) on June 29, 1984, seeking authority to issue certain securities in an amount not to exceed $425,000,000, more than four times the size of any previous financing request. The petition was assigned docket number DF 84-167, by the PUC, and Seacoast Anti-Pollution League (SAPL), Consumer Advocate, Conservation Law Foundation and others were granted intervenor status.

SAPL promptly moved to disqualify Chairman Paul McQuade pursuant to RSA 363:12 (Supp. 1983), alleging that he had violated the code of ethics requiring commissioners to perform their duties impartially. The basis for the motion was a 17-page speech about Seabrook made by Chairman McQuade on June 28, 1984, before the Portsmouth Chamber of Commerce. During that speech, Chairman

McQuade expressed his opinions about the likely amount and timing of rate increases to be imposed on ratepayers as a result of the Seabrook project, he commented on the advisability of bankruptcy for PSNH, he stated conclusions regarding the feasibility of the proposed new financing scheme, and he endorsed the role of the newly-hired construction expert, William B. Derrickson, as an expert for PSNH.

SAPL submitted two separate motions on this issue, one in docket numbers DF 84-167, DR 84-168, DR 83-152, DR 83-398 and DF 83-331 and another in DF 84-200, now pending before the PUC. Chairman McQuade denied the motion in all cases except DF 84-200, which is still pending. SAPL appeals this decision.

The second issue in this appeal concerns the determination of the proper scope of financing proceedings in docket DF 84-167. SAPL first addressed this issue in its motion of July 19, 1984, in which it requested a prehearing conference to determine the scope of financing proceedings. This concern was addressed in SAPL's response to the PUC's request for opinions regarding the proper scope of the financing proceedings, dated July 26, 1984. On July 30, 1984, the PUC agreed that the scope of the hearing should be broadened in light of *Appeal of Roger Easton*, 125 N.H. 205, 480 A.2d 88 (1984). After an objection of PSNH and a hearing, however, the PUC changed its view as to the necessary scope of the hearing and narrowed the issues to be considered. On August 7, 1984, SAPL moved for a rehearing on the PUC order to narrow the scope of the hearing, which was denied. SAPL also appeals the PUC's decision to limit the scope of its proceedings on the authority of PSNH to issue up to $425,000,000 in securities.

The PUC issued its decision in DF 84-167 approving the financing request on August 28, 1984, with each commissioner writing separately, Commissioner Aeschliman dissenting. That decision has not yet been appealed. The PUC majority attached the following conditions to the approval: (1) quarterly reports of the application of the proceeds of the financing; (2) maintenance of the status quo at Seabrook, with construction at the $5 million a week level; (3) retirement of the debt to United Engineers and Constructors; and (4) the timely completion of the Schiller conversion. The majority concluded that the financing was in the public good, stating that it was making no inferences as to future rate-making as a result of its approval.

It is agreed that the public offering sought by the company is to authorize $155 million in debentures and warrants for purchase of PSNH stock. An exchange offering of $90 million and $180 million rounds out the requested $425 million. The PUC considered and

rejected the proposal of a more limited "bridge" financing to maintain the status quo until the newly-restructured Seabrook plan, dubbed "Newbrook," could be investigated in docket DF 84-200.

## I. *Disqualification*

We first turn to the intervenors' motions to disqualify Chairman McQuade. In their motions to disqualify, the intervenors allege that McQuade violated the standards of behavior outlined in the statutory code of ethics governing the conduct of all PUC commissioners, RSA 363:12 (Supp. 1983). Pointing to RSA 363:12, IV (Supp. 1983), which provides that a commissioner shall refrain from making public comment, the intervenors contend that certain statements made by McQuade, in a speech he gave on June 28, 1984, to the Portsmouth Chamber of Commerce, demonstrate that his impartiality on certain matters pending before the PUC could reasonably be questioned, RSA 363:12, VII (Supp. 1983). Certain intervenors thus urged McQuade to disqualify himself pursuant to RSA 363:12, VII (Supp. 1983).

In a decision dated July 18, 1984, McQuade denied the intervenors' motions. He reasoned that if a commissioner "approach[es] each new docket with an open mind, view[s] the record evidence as presented in the proceeding and abide[s] by the oath of office to uphold the laws of the State of New Hampshire . . . there is no requirement of disqualification for bias," and concluded that he would approach the matter with an open mind and would render a decision based on the record evidence. He further stated that his prepared remarks "in no way reflected prejudgment, crystalized opinions or any conclusions of fact."

In 1979, the legislature amended RSA chapter 363 by including a code of ethics, RSA 363:12 (Supp. 1983), in which it directed that

> "a commissioner shall conduct himself and his affairs in accordance with a code of ethics that shall include, but not be limited to, the following elements:
>
> I. Avoidance of impropriety and the appearance of impropriety in all his activities;
>
> II. Performance of his duties impartially and diligently;
>
> III. Avoidance of all ex-parte communications concerning a case pending before the commission;
>
> IV. Abstention from public comment about a matter pending before the commission and require similar abstention on the part of commission personnel;

. . . .

VII. Disqualify himself from proceedings in which his impartiality might be reasonably questioned . . ."

In a recent case in which the propriety of ex parte communications made by a prior chairman of the commission was questioned, this court pointed to the above-quoted statutory code of conduct as demonstrating the legislative recognition of the need for neutrality and impartiality and reminded the PUC that:

"as long ago as 1929 this court recognized that the PUC was created by the legislature as a 'state tribunal, imposing upon it important judicial duties.' *Parker-Young Co. v. State*, 83 N.H. 551, 556, 145 A. 786, 789 (1929). When it is not acting in a rule-making capacity but in an adjudicative one, *see* 3 K. DAVIS, *supra* § 14:5, at 24–28, the procedural posture of the PUC is different. 'If private rights are affected by the board's decision the decision is a judicial one.' *Petition of Boston & Maine Corp.*, 109 N.H. 324, 327, 251 A.2d 332, 336 (1969) (decision of PUC, closing railroad grade crossing, was judicial).

The legislature reaffirmed that the PUC frequently performs an adjudicative role, when it restructured the PUC in 1979. Speaking on behalf of the Senate committee reporting out House bill 261, Senator Rock observed that the pay of a commissioner was being raised to 'that equal to the superior court' because the PUC was a 'quasi-judicial body.' N.H.S. JOUR. 1678 (1979); *see id.* at 1225, 1679 (1981). This situation still prevails. *See* RSA 94:1-a (Group T) (Supp. 1981); RSA 491-A:1 (Supp. 1981). If this agency is to serve a judicial function, it will have to comport itself accordingly. *See, e.g.*, RSA 495:1."

*Appeal of Public Service Co. of N.H.*, 122 N.H. 1062, 1073–74, 454 A.2d 435, 442 (1982).

In conclusion, we stated:

"Thus, *ex parte* communications *or public comment* and press releases about pending cases are clear violations of the standard of conduct expected of a commissioner. To be paid as a judge, one must act like a judge. *See* N.H. SUP. CT. R. 38, Canon 3 A(4), (6) (CODE OF JUDICIAL CONDUCT). Due process requires members of the PUC to refrain from *ex parte* communications if such an agency is not only to be, but also to appear to be, impartial . . . ."

*Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1074, 454 A.2d 435, 442 (1982) (emphasis added).

■ The legislature has mandated that a commissioner must "disqualify himself from proceedings in which his impartiality *might be reasonably questioned.*" RSA 363:12, VII (Supp. 1983) (emphasis added). This provision mirrors the federal statute requiring disqualification of a judge "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C.A. § 455(a) (Supp. 1984). Although we have not had occasion to construe RSA 363:12, VII (Supp. 1983) in the past, we note that the federal courts have interpreted 28 U.S.C.A. § 455(a) (Supp. 1984) "as establishing an objective-reasonable person standard." *Home Placement Service, Inc. v. Providence Journal Co.*, 739 F.2d 671, 674 (1st Cir. 1984); *e.g., United States v. Nelson*, 718 F.2d 315, 321 (9th Cir. 1983); *United States v. Dalfonso*, 707 F.2d 757, 760 (3rd Cir. 1983); *United States v. Norton*, 700 F.2d 1072, 1076 (6th Cir.), *cert. denied*, 103 S. Ct. 1885 (1983); *United States v. Miranne*, 688 F.2d 980, 985 (5th Cir. 1982), *cert. denied*, 103 S. Ct. 736 (1983); *United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir. 1981), *cert. denied*, 455 U.S. 940 (1982); *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (3rd Cir.), *cert. denied*, 449 U.S. 820 (1980).

The First Circuit recently construed the objective-reasonable person standard, stating: "Such a standard allows recusal when objective appearances provide a factual basis to doubt impartiality, even though the judge himself may subjectively be confident of his ability to be evenhanded." *Home Placement Service, Inc. v. Providence Journal Co.*, 739 F.2d at 674 (quoting *Blizard v. Frechette*, 601 F.2d 1217, 1220 (1st Cir. 1979)). *See also United States v. Kelley*, 712 F.2d 884, 890 (1st Cir. 1983); *In re United States*, 666 F.2d 690, 695 (1st Cir. 1981); *Brody v. President & Fellows of Harvard College*, 664 F.2d 10, 11 (1st Cir. 1981), *cert. denied*, 455 U.S. 1027 (1982); *United States v. Mirkin*, 649 F.2d 78, 81 (1st Cir. 1981); *United States v. Parrilla Bonilla*, 626 F.2d 177, 179 (1st Cir. 1980).

Turning to the speech that is the basis for the intervenors' motions to disqualify in the instant case, we begin our analysis by noting the circumstances surrounding the giving of McQuade's speech. In the spring of this past year, it was revealed that the cost and completion estimates for the Seabrook nuclear generating project greatly exceeded past figures and dates. A loss in short-term credit placed PSNH on the brink of bankruptcy. In an effort to overcome PSNH's financial crisis, Merrill Lynch developed a complex financial plan to allow the company to meet its financial needs until Seabrook Unit I is completed. The financial plan is, in reality, a three-phase package designed to reestablish PSNH's financial integrity. The first part of the plan involved a June 1984 issuance of $90,000,000 in short-term

notes. The $425,000,000 issuance at issue in this appeal is clearly phase II of the plan.

On June 29, 1984, Chairman McQuade stood before the Portsmouth Chamber of Commerce and commented on recent Seabrook events. At that time, McQuade had participated in the PUC's investigation of phase I of the Merrill Lynch "plan" or "package" and, thus, clearly knew that financing requests, designed to implement phases II and III of the package, were to come before the commission. In fact, McQuade made reference to his knowledge when during the speech he remarked that PSNH had brought "in to play a nationally respected financial institution, who is providing a complete package up front." Despite his knowledge of the precarious financial situation of PSNH and impending future financing requests, which, according to PSNH, are crucial to the success of the financial plan, McQuade made a speech which included the following remarks.

First, McQuade remarked that certain changes agreed to by PSNH, amongst which he noted the complete financial package, "appear to be in the best interest of New Hampshire." He stated how "pleased" he was with the changes PSNH had made "so that Seabrook Unit I can be financed, completed and operated." He further commented that "Public Service Company will be with us for a long time. We must put past events behind us and look to a bright future working together with Public Service Company to serve the people of New Hampshire." In commenting on Seabrook Unit I, McQuade stated that "[t]he Seabrook project was almost scrapped. Luckily, more sensible and realistic options were offered by the newly-hired William Derrickson, who is recognized as a proven expert in nuclear construction."

■■ Clearly, these comments provide a factual basis for reasonably questioning McQuade's impartiality in exercising his statutorily mandated duty, as a member of the PUC, to determine whether the proposed financing, which implements phase II of the Merrill Lynch plan, is in the public good. *See* RSA 369:4; *Appeal of Easton,* 125 N.H. 205, 211, 480 A.2d 88, 90 (1984). Whether or not McQuade subjectively has kept an open and neutral mind is not the test. Rather, whether facts exist for a reasonable person to question his impartiality is the standard by which a disqualification under RSA 363:12, VII (Supp. 1984) is to be judged. By making a speech containing his commendation of PSNH's efforts to avoid bankruptcy and complete Unit I and by referring to the Merrill Lynch package as appearing to be in the best interest of New Hampshire, at a time when he was well aware that he would be deciding future financing

requests which PSNH has characterized as crucial to the success of the "bail-out" plan, McQuade allowed his impartiality on the matters pending before the commission to be questioned. It is the time, place and content of his speech that are the problem here.

We do not mean to imply by our decision today that a commissioner cannot possess preconceived views with respect to legal or economic policies. Such a holding would be absurd, as it would necessitate the disqualification of judges and those acting in a judicial capacity "on cases involving issues of law or policy on which they had previously manifested strong diverging views . . . ." *N.H. Milk Dealers' Ass'n v. Milk Control Board,* 107 N.H. 335, 339, 222 A.2d 194, 198 (1966). Rather, in recognizing the need for neutrality and impartiality and thus mandating disqualification where impartiality can reasonably be questioned, the legislature sought to avoid partiality concerning issues of fact involved in pending matters. *See id.*

■ It seems ironic that, two years ago, a prior chairman of the PUC triggered a reversal of a PUC decision by soliciting ex parte communications on a Seabrook matter pending before the commission. The current chairman was then a member of the commission. The law has not changed since our decision in *Appeal of Public Service Co. of New Hampshire,* 122 N.H. 1062, 454 A.2d 435 (1982). The legislative command remains the same—a commissioner may speak about the regulatory process, RSA 363:12-a (Supp. 1983), but he must abstain "from public comment about a matter pending before the commission." RSA 363:12, IV (Supp. 1983).

Because we conclude that Chairman McQuade should have disqualified himself from DF 84-167 pursuant to RSA 363:12, VII (Supp. 1983), there is no majority as required under RSA 363:16. Accordingly, we remand the matter to the PUC.

II. *Scope of Hearing*

As its second issue on this expedited appeal, SAPL challenges the legality of the commission's order of August 2, 1984, limiting the scope of its inquiry to determine whether it should grant the company's request to authorize the 425 million dollar financing. Given our conclusion that the chairman was disqualified to sit on this matter, the August 2 order must be vacated and the issue reconsidered by the remaining commissioners, and by any substitute, if one is needed. See RSA 363:20. Nevertheless, since this second issue will be before the commission again, we will address its merits in this appeal.

As we noted above, in its order of July 30, 1984, the commission explicitly recognized that the opinion of this court in *Appeal of*

*Roger Easton supra* made it appropriate for the commission to evaluate "the long term alternatives to completion of Seabrook Unit I in the context of the . . . incremental cost [of completion] and the assumptions found by the commission to be reasonable . . . ." The commission then proceeded to consider two preliminary issues: the date on which a failure to rule on the present financing request would be a "de facto denial," and the feasibility of "bifurcating the Petition to allow 'bridge' financing so that the company can meet its cash needs during the course of extended Commission proceedings" concerning alternatives to completing Seabrook Unit I.

The PUC found on "uncontradicted and credible" evidence that a failure to rule by August 31, 1984, would be a de facto denial. Although the feasibility of "bridge" financing was vigorously contested, the commission unanimously concluded that it "must hear evidence on the merits of the financing as proposed by the Company in its petition."

From these conclusions, the commission then determined that it was not feasible to attempt to inquire into alternatives to completion of the first Seabrook unit by August 31. The commission decided in effect that its consideration of the "Newbrook" proposal could afford an appropriate opportunity to inquire into alternatives to completing the Seabrook reactor. The commission also determined that only about ten percent of the proposed financing would be used for the "'to go' cash cost of Seabrook Construction" prior to the commission's next anticipated financing order approving or disapproving the so-called "Newbrook" proposal. The PUC then decided unanimously that it would be reasonable to defer the inquiry into Seabrook alternatives until the time of the separate proceeding to consider the "Newbrook" proposal. Accordingly, its order narrowed the scope of the present proceeding to eliminate an inquiry into alternatives, and required the immediate opening of a new docket, DF 84-200, for that purpose. SAPL contends that this order must be reversed as inconsistent with our holding in *Appeal of Roger Easton supra*. We disagree.

■■ This appeal is governed by the provisions of RSA chapter 541. See RSA 365:21. Therefore, the order dated August 2, 1984, may not on the merits be "set aside or vacated except for errors of law, unless the court is satisfied by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 541:13. The commission's findings of fact on which its justice and reasonableness must be judged "shall be deemed to be prima facie lawful and reasonable." *Id.*

We must first determine, then, whether the commission commit-

ted any error of law, which requires a consideration of *Appeal of Roger Easton supra.* There we held that the scope of a financing proceeding under RSA chapter 369, like the present one, was not limited to the terms of the proposed financing. In that particular case we held that before the proposed financing was approved or disapproved, it was legitimate to determine whether the utility's ownership interest in the Seabrook project was in the public interest at present estimated costs. More broadly, we affirmed the PUC's "duty to determine whether, under all the circumstances, the financing is in the public good—a determination which includes considerations beyond the terms of the proposed borrowing."

When and how such a determination must be made will necessarily vary with circumstances. On the one hand, the PUC need not allow relitigation of such a determination when there is no reason to believe that there has been a material change of facts from the time of a prior determination. On the other hand, when there are reasonable grounds to believe that such facts have changed, the commission has a duty to reconsider prior determinations of the public interest that may have been rendered obsolete. When such reasonable grounds exist, the PUC cannot refuse to make the required inquiry by postponing it until after a financing decision that would render it academic.

If the record before us demonstrated that the present financing proceeding provided the only opportunity to assess the alternatives to completing the first Seabrook unit, the order eliminating that inquiry would be inconsistent with our holding in *Easton.* The record indicates otherwise, however. It is undisputed that a further proceeding to consider the ultimate merits of the "Newbrook" proposal will be necessary, and in fact its scheduling has already been established. This will provide an appropriate context to assess alternatives to the completion of Seabrook, and the PUC has ordered such an assessment to be made. While there was only one opportunity for such an inquiry in *Easton,* there are two opportunities in this case. There was no error of law in the commission's decision to choose the second opportunity, unless that was not a realistic opportunity at all. This brings us to a consideration of whether the appellants have demonstrated that the commission acted unreasonably in choosing to defer the inquiry to the further proceeding. We are satisfied that there has been no such demonstration.

The reasonableness of the commission's action has been attacked from several directions. SAPL takes the position that one, if not the only, alternative to the requested financing is the company's bankruptcy, and it argues that the PUC cannot lawfully approve any portion of the proposed financing until it has considered the bank-

ruptcy alternative. SAPL has not, however, shown that the relative merits of bankruptcy and financing could have been assessed adequately by August 31, 1984, and consequently it has not demonstrated that the commission was unreasonable simply in deferring an examination of SAPL's position to the further proceeding to give final consideration to the "Newbrook" proposal.

Certain other intervenors seem to argue that it was the refusal to limit the possible financing under the present request to limited "bridge" financing that doomed the proceeding to illegality under *Easton*. This argument is essentially identical to SAPL's further contention, that the August 2 order guaranteed that approval of the financing request would be a form of incremental decision-making that would render *Easton* a dead letter. The question raised by these arguments is whether the appellants have demonstrated that the approval of any financing, or anything more than limited "bridge" financing, renders academic any later inquiry into alternatives to the completion of unit one of Seabrook. The answer is that the appellants have not so demonstrated by that "clear preponderance of the evidence" that RSA 541:13 requires.

There is no question that in a perfect world it would be preferable to make the inquiry into alternatives before another penny is spent. There is apparently no question, as the appellants argue, that the object of this financing includes the ultimate completion of the first Seabrook unit. These two conclusions, however, do not carry the appellants' burden to demonstrate that the approval of this financing effectively eliminates a realistic consideration of alternatives to the completion of Seabrook.

In holding that the appellants have not met this burden, we have considered the finding in the commission's unanimous report of August 2, that about ninety percent of the present funding will be required for purposes other than new construction at Seabrook. There is no basis to reject this finding. Further, the transcript contains testimony that the further "Newbrook" proceeding will include a request to approve a further $350 million of financing, some of which will be requested for new construction. It simply cannot be said, therefore, that approval of this financing is either approval of $425 million in new construction or final approval in fact of plans to complete Seabrook construction. The possibility that Seabrook may not be completed is therefore a risk that investors must bear when they buy the proposed financing instruments.

■ We therefore conclude that the PUC did not act unlawfully or unreasonably in limiting the scope of the present financing proceeding.

*July 18, 1984 order of Chairman McQuade
reversed; August 2, 1984 order is vacated;
August 28, 1984 order shall be vacated;
remanded.*

BROCK, J., concurred specially as to part I; KING, C.J., and BATCHELDER, J., dissented as to part II.

BROCK, J., concurring specially as to part I: I write separately on the issue of disqualification only to express my view that our State Constitution and laws create clear distinctions between the duties of a commissioner and those of a judge, and that these distinctions must be taken into account in any evaluation of either official's "impartiality."

A judge is a member of a separate and independent branch of government, bound only to decide cases in accordance with the constitution and laws of New Hampshire and of the United States, while a member of the PUC is an official of the executive branch. The commission has extensive responsibility for statewide energy planning, containing a legislatively-created department with that function. RSA 363:27, II (Supp. 1983). The statutes clearly contemplate that the commission will "confer and cooperate" with other executive branch agencies in these and other matters involving the State's energy policy. RSA 363:18.

This court has held that these activities of the commission must not "impinge upon the impartiality of the PUC commissioners." *Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1077, 454 A.2d 435, 444 (1982). It is clear, however, that "impartiality" must be defined in the context of the commission's policy-making role. As a leading authority on administrative law has written:

> "A prejudgment or point of view about a question of law or policy, even if so tenaciously held as to suggest a closed mind, is not, without more, a disqualification . . . . [, nor is] a prejudgment about legislative facts that help answer a question of law or policy . . . [, nor] [a]dvance knowledge of adjudicative facts that are in issue . . . , but a prior *commitment* may be."

3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 19.1, at 371 (2d ed. 1980) (emphasis added).

In this case, I agree that Mr. McQuade's remarks might cause his impartiality to be reasonably questioned, and that accordingly he had a duty to disqualify himself under RSA 363:12, VII (Supp. 1983). I believe, however, that in matters as complex as this one,

where the commission deals over a period of months or years with a series of questions involving the same subject matter, and having broad implications for the direction of state energy policy, the line between prejudgment of policy and prejudgment of adjudicative facts is faint at best.

While I believe that commissioners must not be penalized for relying on the provisions of RSA 363:12-a (Supp. 1983) ("A commissioner may speak . . . concerning the regulatory process in New Hampshire"), where their public statements raise legitimate questions concerning their impartiality, as in the present case, the legislative mandate requires their disqualification.

Nevertheless, I have serious reservations about the applicability in practice of a judicial standard of impartiality to a PUC commissioner, whose job is so inextricably concerned with executive, policy-making functions.

KING, C.J., with whom BATCHELDER, J., concurs, dissenting as to part II: This financial proceeding was instituted to consider a petition filed by Public Service Company of New Hampshire with the public utilities commission seeking approval under RSA 369:1 of the company's proposed issuance of $425 million in units, debentures, and common stock and for the commission to determine that such an unprecedented large financing was consistent with the public good.

After the initiation of the PUC docket DF 84-167, this Court issued its ruling in *Appeal of Roger Easton*, 125 N.H. 205, 480 A.2d 88 (1984). In *Easton* this Court held that in an RSA chapter 369 inquiry the PUC has the "duty to determine whether, under all the circumstances, the financing is in the public good—a determination which includes considerations beyond the terms of the proposed borrowing"—and that "legitimate matters for consideration under RSA chapter 369" include "whether the uses to which the [financing] will be put can be economically justified compared to other options available to the [utility]" and "whether the capitalization of [the] utility is jeopardized" by the proposed financing. *Appeal of Easton*, *supra* at 212–13, 480 A.2d at 90–91.

On July 30, the commission acknowledged that this broad inquiry was necessary and by supplemental order defined the scope of DF 84-167 to include an evaluation of the economic wisdom of the underlying use of the company's finances—the completion of Seabrook Unit 1. The inquiry would encompass a range of Seabrook issues (including the cost of the plant, the alternatives to plant completion, and the financial feasibility and rate needs associated with plant completion).

The PUC commenced taking evidence on the possibility of an interim smaller financing pending the completion of a full *Easton* review. During these hearings, the commission was told by company witnesses that the $425 million financing was an integral part of the financial plan of Merrill Lynch to complete Seabrook Unit I and that its size was determined by the requirements of the larger financial plan.

The company's argument prevailed with the PUC and on August 2, 1984, the PUC reversed its prior scope order and decided to address the larger Seabrook issues in a future docket, DF 84-200. The commission based its rulings on its belief that the $425 million invoked direct Seabrook expenditures and that the precarious condition of the company's finances required "regulatory responsiveness." In effect, the rationale appears to be that the more precarious the condition of a utility, the more responsive the regulatory commission and the narrower the scope of regulatory scrutiny. The commission's actions were prompted by the company's contention that its financial condition required emergency relief and did not allow sufficient time to undertake a full review under RSA chapter 369.

On August 28, 1984, a majority of the commission approved the entire $425 million. The commission admitted that its narrowed and truncated procedural schedule did not allow the opportunity to conduct an adequate investigation into the full scope of Seabrook related issues.

The commission disputes the *Easton* requirement that the commission consider whether Seabrook Unit I completion "can be economically justified compared to other options available to the [utility]." The broad scope of review required by the statute and by *Easton* is not complied with by ineffective deferral until a later date. While the commission agreed that an emergency existed, the commission did not limit itself to approval of the amount of financing to meet the emergency but in effect approved a larger range capital plan without an adequate examination of that plan.

We would remand this petition to the PUC for proceedings consistent with the requirements of RSA chapter 369 and the scope of review required by *Easton*.