Nuclear Decommissioning Finance Committee
No. 89-336

APPEAL OF CAMPAIGN FOR RATEPAYERS RIGHTS
(New Hampshire Nuclear Decommissioning Finance Committee)

August 1, 1990

*Backus, Meyer & Solomon*, of Manchester (*Robert A. Backus* on the brief and orally), for Campaign for Ratepayers Rights.

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*Edward A. Haffer* on the brief and orally), for New Hampshire Yankee Division of Public Service Company of New Hampshire.

*Alexander J. Kalinski*, of Manchester, by brief for the Nuclear Decommissioning Finance Committee, as *amicus curiae*.

BATCHELDER, J. Campaign for Ratepayers Rights (CRR) appeals from an order of the Nuclear Decommissioning Finance Com-

mittee (committee) establishing a schedule of payments which will eventually fund the decommissioning of the Seabrook nuclear power plant. In particular, the CRR claims that certain findings made by the committee were unsupported by the evidence and that CRR's due process rights guaranteed by the State and Federal Constitutions were violated because an employee of Public Service Company of New Hampshire (PSNH) was acting as a committee member. For the following reasons, we affirm.

On May 4, 1981, the legislature passed House Bill 1, creating the Nuclear Decommissioning Finance Committee. The committee was established for the purpose of ensuring the safety and well-being of the public and future generations by protecting them not only from the substantial and predictable costs associated with the decommissioning of nuclear power plants, but also from any subsequent health hazards presented by the sites themselves. RSA 162-F:1 (Supp. 1989). The committee is charged with carrying out its purpose through a series of public hearings directed at establishing and maintaining funds that would finance the decommissioning of nuclear facilities. RSA 162-F:19, :21 (Supp. 1989). The contributions to such funds are to be made by the owners of the facilities and are ultimately paid by those who purchase power generated by the facility. The committee may, should it later conclude that the contributions will either exceed or fall short of the projected decommissioning costs, hold another public hearing to determine what adjustments in the amount of contributions are necessary. RSA 162-F:22 (Supp. 1989).

During the first and third weeks of March 1988, a series of public hearings were held to determine the cost of decommissioning the Seabrook nuclear power plant. Inherent in this process is the task of allocating the costs among the various owners in proportion to their respective interests, and establishing a payment schedule calculated to generate the funds necessary to cover the projected decommissioning costs. At the March 1988 public hearings, PSNH presented the testimony of its expert, Thomas A. LaGuardia, a mechanical engineer with almost twenty years experience decommissioning nuclear power plants and co-author of the United States Department of Energy's Decommissioning Handbook. During the course of the hearing, Mr. LaGuardia testified that in his opinion the best method of decommissioning Seabrook would be by prompt removal and dismantlement (DECON), at the cost of $242,429,000 in 1987 dollars. As Mr. LaGuardia testified, the DECON method of decommissioning

requires that, once the facility ceases to generate electricity, it would be immediately dismantled, the debris being trucked to a landfill for burial. Mr. LaGuardia's estimate as to the cost of decommissioning was premised on the assumption that a landfill where the high and low-level nuclear wastes involved in the dismantlement could be disposed of would be located within 250 miles of Seabrook, although no such site exists now. Mr. LaGuardia testified that the amount of $242,429,000 included a 25% contingency factor.

With regard to how the costs should be allocated among the various owners, PSNH offered the testimony of William P. Hannon. Utilizing Mr. LaGuardia's cost estimates, Mr. Hannon prepared two specific payment schedules, one for taxable owners and one for tax-exempt owners, setting forth the monthly contributions necessary to accumulate the projected funds needed for decommissioning. Since the tax-exempt owners can expect a greater rate of return on their contributions than can the taxable owners, two payment schedules are needed to ensure an equitable division of the decommissioning costs. Witness Hannon testified that the monthly payments made by the taxable and tax-exempt owners should total $346,351, which over the forty-year term of the plant's operating license would accumulate to $1.2 billion dollars. Mr. Hannon testified that the payments should be adjusted annually employing a long-run cost escalation rate of 4%.

In response to the testimony of Mr. LaGuardia and Mr. Hannon, the CRR offered the testimony of Larry S. Eckhaus, a financial analyst currently employed by the public utilities commission, office of the consumer advocate. Based upon the evidence presented by PSNH's experts, Mr. Eckhaus testified that, in the absence of a currently available landfill within 250 miles of Seabrook that could receive wastes generated during dismantlement, the estimates for decommissioning costs should be calculated based upon the method of decommissioning referred to as SAFSTOR. Using the SAFSTOR method the plant would be "mothballed" for thirty years prior to dismantlement while the levels of radioactivity decay. Mr. Eckhaus testified that the cost of decommissioning using the SAFSTOR method would be $553,000,000 in 1987 dollars.

Mr. Eckhaus also disagreed with the assumption that Seabrook would necessarily generate electricity for the full forty-year term of its operating license and testified that thirty-five years was a more realistic projection. At oral argument before this court, counsel for CRR pointed out that the average life span of those nuclear power

plants that have already been decommissioned is approximately seventeen years. However, the record does not contain any scientific evidence showing similarities in plant design or other characteristics that would support the CRR's contention that Seabrook's life span would be of equal duration. Last, Mr. Eckhaus disagreed with the use of a 4% annual long-run cost escalation rate, claiming that a rate of 5.2% was more realistic in light of the United States Nuclear Regulatory Commission's (NRC) recommendation that the rate be twice that of the consumer price index. Accordingly, Mr. Eckhaus testified that monthly contributions should be 1.3 million dollars based upon the SAFSTOR method of decommissioning, which over thirty-five years would accumulate to 1.8 billion dollars.

At the conclusion of the hearing, the committee issued an order finding that (1) the amount of $242,429,000 in 1987 dollars is a reasonable and proper estimate as to the cost of decommissioning the Seabrook plant, (2) the 4% annual long-run cost escalation rate is an appropriate rate to adjust for inflation, and (3) the payment schedule submitted by Mr. Hannon detailed a reasonable allocation of decommissioning costs between the taxable and tax-exempt owners of the facility. On appeal, CRR claims that the committee's findings were not supported by the evidence and that they are unjust and unreasonable.

■■ Appeals seeking to set aside the findings or rulings of the committee are governed by RSA 541:13, which provides that the party challenging the order or decision must show, by the preponderance of the evidence, that the order or decision is unlawful, unreasonable or unjust. RSA 541:13; *Appeal of Seacoast Anti-Pollution League*, 125 N.H. 465, 473, 482 A.2d 509, 516 (1984). However, prior to such a showing, the findings of the committee are presumed to be *prima facie* lawful and reasonable. *Id.* In overcoming this presumption, the appealing party may demonstrate that the record does not contain sufficient evidence to support the committee's decision. *Appeal of Granite State Elec. Co.*, 121 N.H. 787, 791, 435 A.2d 119, 121 (1981). Whether or not this court would have reached a different conclusion, based upon the weight of the evidence presented before the committee, is of no consequence since we will not substitute our judgment for that of the committee. *Appeal of Peirce*, 122 N.H. 762, 765, 451 A.2d 363, 365 (1982).

■ The CRR has not met its burden of showing that the committee's findings are either unreasonable or unjust. It has failed to pre-

sent sufficient scientific evidence to support its claims. Without such evidence the assertion that Seabrook is unlikely to generate electricity for the full forty-year term of its operating license remains the product of speculation. This is equally true of the CRR's contention that it is unreasonable to assume that there will be a site within 250 miles of Seabrook to accept the high and low-level wastes involved in the decommissioning process. While we are among the first to recognize that some of the projections made with regard to the costs associated with the construction of the Seabrook plant have been optimistic to say the least, *Appeal of Conservation Law Foundation*, 127 N.H. 606, 649, 507 A.2d 652, 681–82 (1986) (King, C.J., and Batchelder, J., dissenting), we are not prepared, based on our past experience alone, to presume that the projections as to the decommissioning costs adopted by the committee are equally unreliable. Accordingly, we hold that the findings of the committee are supported by the evidence and are neither unreasonable nor unjust.

■ The CRR's second argument is that its constitutional due process rights as guaranteed by both the State and Federal Constitutions were violated by RSA 162-F:15, II (Supp. 1989), which requires that an employee of PSNH serve as a member of the committee. Part I, article 35 of the New Hampshire Constitution requires that all judges be "as impartial as the lot of humanity will admit." N.H. CONST. pt. I, art. 35. However, this due process argument was not raised during the course of the hearing before the committee and was only raised in the CRR's motion for rehearing. RSA 541:3 provides that a party may apply for rehearing as to "any matter determined in the action or proceeding, or covered or included in the order. . . ." RSA 541:3. Since this due process argument was not addressed during the course of the hearing or in the committee's order, it was improperly included in the motion for rehearing and was therefore not properly raised on appeal. *In re Appeal of Working on Waste*, 133 N.H. 312, 315–16, 577 A.2d 403, 406 (1990).

Nonetheless, the CRR claims that its objections as to the constitutionality of RSA 162-F:15, II (Supp. 1989) would have been merely *pro forma* since the committee lacked the authority to declare the statute unconstitutional. Even if we were to agree with this argument and allow the issue to be raised on appeal, in order for us to conclude that the committee member should be disqualified we would have to find, from the record before us, that the member had an interest in the hearing's outcome that was "immediate, definite, and capable of demonstration; not remote, uncertain, contingent,

and speculative." *State ex rel. Thomson v. State Bd. of Parole*, 115 N.H. 414, 422, 342 A.2d 634, 639 (1975) (quoting *Atherton v. Concord*, 109 N.H. 164, 165, 245 A.2d 387, 388 (1968)). Since the only evidence before us is the unsupported assertion made by the CRR that "[b]oth Mr. Romer and [PSNH] clearly had direct pecuniary interests at stake; Mr. Romer in his continued employment, the Applicant [PSNH] in the success of its commercial venture, through expedition of decommissioning proceedings," we can not say that the committee member is lacking in impartiality and that the statutory scheme of RSA 162-F:15, II (Supp. 1989) is unconstitutional. To hold otherwise would require us to engage in the very type of speculation forbidden by *Thomson. See id.*

■ The CRR's final argument is that the committee violated the provisions of RSA 541-A:20 (Supp. 1989) in failing to rule on certain requests for findings submitted by the parties. RSA 541-A:20 (Supp. 1989) provides that the committee, in rendering its decision, "shall include a ruling upon each proposed finding." However, since the CRR did not itself submit any requests for findings, we hold that it has no standing to challenge the actions of the committee as they pertain to findings submitted by third parties. *See MacNeill v. Brownell*, 133 N.H. 184, 190, 574 A.2d 1375, 1378 (1990).

*Affirmed.*

HORTON, J., did not sit; the others concurred.