Merrimack
No. 88-426

DORIS MACNEILL

v.

WILMER L. AND MARY L. BROWNELL

May 23, 1990

*McSwiney, Jones, Semple & Douglas P.C.*, of Concord, and *Elizabeth Cazden*, of Manchester (*Carroll F. Jones* and *Ms. Cazden* on the brief, and *Ms. Cazden* orally), for the plaintiff.

*Gallagher, Callahan & Gartrell P.A.*, of Concord (*Donald E. Gartrell* and *Andrew B. Eills* on the brief, and *Mr. Gartrell* orally), for the defendants.

BATCHELDER, J.  The defendants, Wilmer and Mary L. Brownell, appeal from a ruling of the Superior Court (*Flynn*, J.), approving a report by the Master (*Robert E. Hinchey*, Esq.), quieting title in the plaintiff, Doris MacNeill, and permanently enjoining the defendants from entering onto, or asserting any claim in, the subject property. For the following reasons, we affirm.

This appeal involves a dispute over two parcels of land located in Danbury, one commonly referred to as "the island," the other known as "the ridge." In the winter of 1984, the plaintiff, self-proclaimed title holder for twenty-eight years to both the island and ridge parcels, was informed that the defendant, Wilmer L. Brownell, had been observed taking gravel from an area known as the "swimming hole" on the island parcel. In addition, it came to the plaintiff's attention that Mr. Brownell had also removed quantities of timber from the island parcel. The plaintiff's attorney contacted Mr. Brownell, advising him to stop cutting trees. Mr. Brownell, however, gave no assurances, claiming ownership of the parcels by deed dated March 21, 1984, from the heirs of George "Horse Power" Perkins. As a result of

the defendant's actions in removing the gravel and cutting trees, the plaintiff filed suit seeking to have the title to both parcels quieted in her favor.

It is undisputed by the parties that both parcels were once owned by Ira Grow for a period up until two conveyances that took place in 1840 and 1842. The dispute as to the ridge parcel centers on these two conveyances. By deed dated March 23, 1840, Ira Grow conveyed a certain parcel of land to Cummings Hubbard. The transcription of this deed that was entered into evidence contained, in part, the following language:

> "beginning at a certain stake and stones, which is on the south side of the ridge and south of James Smith's mills and Smith's river, and south of the mill yard, and is near one large pine stump, and is the same described in deed from one said Grow, to said Hubbard of March 4, 1840, thence an Easterly course on said Hubbard's northerly line to said Hubbard's north easterly corner, thence a northerly course until it strikes the south bank of Smith's river, adjoining land of Alexander Curtis, thence running up said river and bounded on the south bank of the South stream, which leads to Smith's mills, until it reaches as near as ten rods to where the water leaves Smith's Shingle mill below said Saw Mill, thence to strike a straight line to the first mentioned bound at stake and stones, meaning by this deed to convey to said Hubbard only what land is now held by me under deed from Samuel Pillsbury Esq. to one said Grow . . . which is east of said ten rods below Shingle machines below Smith's river saw Mill, and on the south side of the south bank of the South Stream leading to said Smith's Mills estimated at twelve acres be the same more or less excepting and reserving all privileges for the use of said Smith's mills..."

The defendants claim that this language conveyed to Hubbard, the defendants' predecessor in title, a parcel of land containing the disputed ridge property. The defendants argue that their survey properly recognizes certain monuments referred to by the deed and should be favored over the plaintiff's interpretation because the plaintiff relies upon descriptions contained within other deeds to locate and lay claim to the ridge property. *See Mastin v. Prescott*, 122 N.H. 353, 355, 444 A.2d 556, 558 (1982).

The plaintiff, on the other hand, claims that the monumentation relied upon by the defendants to locate the mill yard is inconsistent with other deed descriptions and is incompatible with the topography of the area. In particular, the plaintiff claims that the defendants have mistakenly assumed that the mill yard buildings were located adjacent to the old mill dam in an area "unsuitable" for such structures. The plaintiff claims that these buildings were located six-to-eight-hundred feet upstream from the old mill dam in an area that is flat and more appropriate for a mill yard and connecting roadways. The plaintiff, in support of her position, looks to a deed in which Hubbard conveyed the property he had received to Iddo Brown. The plaintiff argues that in order for the court to accept the defendants' claim as to the location of the old mill yard, it would have to read the Hubbard-Brown deed to describe a right-angle turn in a counter-clockwise direction, a result that is contrary to the express language of the deed.

On appeal, the defendants carry the burden of showing that the master's conclusions and recommendations are unsupported by the evidence, *Seward v. Loranger*, 130 N.H. 570, 574, 547 A.2d 207, 210 (1988), or are erroneous as a matter of law. *Alexander v. Town of Hampstead*, 129 N.H. 278, 284, 525 A.2d 276, 280 (1987). Here the defendants have failed to meet their burden. In disputes concerning boundaries of land, the sum of experience in conveyancing teaches us that, all other things being equal, monuments govern distances when the language in a deed is called into question. This approach to the resolution of disputes like the one at hand is not helpful for a number of reasons. The position of a particular identifiable marker such as a monument, stone, post, tree, pin, or other device is not helpful in this case, which is concerned with the respect for monumentation in a larger sense such as the historic location of a mill site; not to determine the particular length of a particular boundary, but rather to determine the overall disputed location of the entire parcel. The master stated the dilemma which he faced, in plain language:

"The decision in this case, as in most of this general nature, turns upon expert evidence. The principal experts . . . both appeared to the Master as honest and unbiased, and both testified in that accord.

The Master is of the opinion that the testimony of [the plaintiff's expert] is more persuasive and more in line with

the bulk of the deed exhibits. Moreover, the cross-examination of this expert witness was unrewarding."

Thus, while it is true that where there is a discrepancy between the distance or location of a particular mete or bound, physical monumentation will ordinarily control over measurements contained within a deed, it does not follow that such monumentation will be determinative where its identity or location is the product of speculation and there exists competent evidence that brings into question reliance upon such monumentation. *See Mastin v. Prescott*, 122 N.H. at 355, 444 A.2d at 558. Since the defendants' claim to the ridge parcel is almost entirely dependent upon the location of certain monumentation, and the plaintiff has produced competent evidence placing such monumentation in a different location, we cannot say that the master's conclusions were unsupported by the evidence or erroneous as a matter of law. We therefore affirm the master's recommendation with respect to the ridge parcel. We now turn to the next issue of whether the master erred in quieting title to the island parcel in the plaintiff.

It is undisputed by the parties that title to the island parcel was held by Florette Emmons for a period prior to September 12, 1914. The dispute over the island parcel involves two conveyances by Florette Emmons, one on September 12, 1914, to Sophia Ford, the plaintiff's predecessor in title, and another on November 23, 1920, to George "Horse Power" Perkins, the defendants' predecessor in title. The transcribed portion of the Emmons-Ford deed that was entered into evidence contained, in pertinent part, the following description:

"Beginning at the said Railroad thence Easterly by the River to line of land of John S. Allen. Thence Southerly by the old bed of the river to land of John S. Allen, thence Southeasterly along land of said Allen to a point. Thence Northwesterly or westerly by land of said Allen to near the car house belonging to said Railroad. Thence westerly along said Railroad to the point begun at.

Meaning to convey all that portion of the Home Farm of the late John H. Emmons situated on the Northeast side of the said Turnpike."

The defendants claim that this conveyance described a small parcel of land to the west of the island. The defendants point to language contained in the recorded setoff of Amelia Emons' dower, Florette Emmons' predecessor in title, in which the island property was recognized as a separate parcel of land and was expressly labeled so.

The defendants argue that since the conveyance from Florette Emmons to Sophia Ford did not refer to the parcel as "the island," only a portion of the property, not including the island, was conveyed. In addition, the defendants claim that the subsequent quitclaim deed from Florette Emmons to George "Horse Power" Perkins conveyed the remaining land held by Florette Emmons, including the island. The defendants rely on the following language contained in that deed:

> "A certain tract of land located in Danbury. . .being the old mill dam or privilege located about seventy-five (75) rods in a Northeasterly direction from the Boston and Maine railroad Station at said Danbury, on Smith River.

> Also another tract of land on the North side of said river near the old dam; meaning to convey all the land on the North and Northeast side of said Smith river so-called, formerly owned by John H. Emmons.

■ A comparison of the two deed descriptions in question reveals that the description contained in the Emmons-Ford deed conforms remarkably well to the physical characteristics of the island parcel. In contrast, the Emmons-Perkins deed is less specific, containing inconsistencies as to the location of the island property. (The Emmons-Perkins deed states that the subject property is located in a northeasterly direction from the Boston and Maine Railroad Station in Danbury, when in fact, the island parcel was located northwesterly of the station.) Even if we were to assume that both deeds described and applied to the island parcel, the Emmons-Perkins quitclaim deed would have conveyed only the interest that the grantor had at the time of conveyance. Since the Emmons-Ford warranty deed predated the Emmons-Perkins quitclaim deed, Florette Emmons had no remaining interest in the island parcel to convey to George "Horse Power" Perkins, the defendants' predecessor in title. Accordingly, we find that the defendants have not met their burden of showing that the master's conclusions or recommendations are unsupported by the evidence or are erroneous as a matter of law, and we therefore affirm with regard to the island parcel. Having found in favor of the plaintiff, we need not consider her argument as it pertains to the issue of adverse possession.

■ Notwithstanding, the defendants argue that the master erred in denying an abutting landowner's motion to intervene. The defendants claim that because the abutting landowner's property interests

were affected by the master's adoption of the plaintiff's survey, they should have been allowed to intervene. Since the defendants lack standing to assert the rights of third parties not present in this appeal, we find no merit to this argument.

*Affirmed.*

SOUTER, J., did not sit; the others concurred.