Carroll
No. 92-625

MICHAEL FLANAGAN & a.

v.

STEVEN AND ELEANOR PRUDHOMME

June 15, 1994

562

*Cooper, Hall, Whittum & Shillaber, P.C.*, of Rochester (*Daniel J. Harkinson* on the brief and orally), for the plaintiffs.

*Sheehan, Phinney, Bass & Green, P.A.*, of Manchester (*Daniel J. Lynch* on the brief and orally), for the defendants.

BROCK, C.J.   The Superior Court (*Dickson*, J.) resolved a dispute among neighbors about property boundaries and the location and use of a deeded right-of-way for access to the shore of Ossipee Lake. Dissatisfied with the results, the defendants, Steven and Eleanor Prudhomme, appeal the trial court's decision on the following grounds: (1) the trial court erroneously relied on parol evidence or

the doctrine of adverse possession rather than on the terms of the deeds to resolve the boundary dispute; (2) the court's finding that the defendants' garage encroached on the plaintiffs' property and the award of $1000 as nominal damages were erroneous; (3) the court erroneously determined the intended use of the right-of-way based on parol evidence; (4) the award of damages for lost rental income was legally erroneous; (5) the award of costs for the plaintiffs' expert witness was excessive and legally erroneous; and (6) the award of attorney's fees to the plaintiffs was error. We affirm in part, reverse in part, and remand.

The parties all own lots with summer cottages in close proximity to each other along Ossipee Lake. Their lots are shown on a map, appended to this decision as appendix one, that designates several of the lots alphabetically. There is a common right-of-way, called the Camp Road, that crosses the lakefront lots approximately parallel to the shoreline. The defendants, Steven and Eleanor Prudhomme, own a lakefront lot, designated on the map as lots B and C, with their newly constructed house and garage. Plaintiffs Michael and Joyce Flanagan own a lakefront lot with a cottage, designated as lot D, and another lot, the back lot, located directly behind the Prudhommes' property. Plaintiffs Rocco Rizzuto and Kathleen Marciano own property with a cottage, which is located directly behind the Flanagans' lakefront lot; a separately deeded strip for a driveway from the Camp Road to their lot; and a deeded right-of-way extending from their driveway across the northern side of the Prudhommes' lot to the lake.

No dispute arose about the boundaries or the use of the right-of-way path to the lake through a series of property owners and for many years until the Prudhommes bought their lot in 1987. The Prudhommes had a survey done of their property and the surrounding area in 1987. Relying on boundaries indicated by their survey, the Prudhommes decided that their northern boundary with the Flanagans' lakefront lot, and the Rizzuto-Marciano right-of-way to the lake, were further north than the path used as the right-of-way and the boundary claimed by the Flanagans. The Prudhommes built a stockade fence across the path and began to build a new house and a garage. When the Flanagans protested that the Prudhommes' land-clearing encroached onto their property, the Prudhommes responded that they could take them to court. As a result, the plaintiffs, the Flanagans, Marciano and Rizzuto, filed a petition for a permanent injunction, to quiet title to the land, and for compensatory damages. The plaintiffs also hired a surveyor to map the dis-

puted properties. The disputed area, which includes the boundary between the Flanagans' and the Prudhommes' lots, hereinafter described as their "east-west boundary," and the Rizzuto-Marciano right-of-way, is designated as the area with diagonal lines between the lots marked C and D on appendix one. The defendants have not appealed the trial court's location of the Rizzuto-Marciano driveway.

The matter was heard in a nonjury trial and a view was taken of the property. The court found that the Flanagans' and Prudhommes' east-west boundary had been set by an oral agreement between the parties' predecessors in title at a line thirty-six feet north of the porch of the Prudhommes' predecessors' cottage. Alternatively, the court found that the same boundary had been established by adverse possession. The court determined, however, that the agreed boundary would "impose a harsh result on the defendants," and decided that a more equitable location, supported by observations made during the view, was warranted. Therefore, the court decreed the east-west boundary to be as drawn on the plaintiffs' survey. The relevant portion of the survey is appended to this decision as appendix two, and the boundary decreed by the trial court is the line drawn between points two and three. The court also decreed the location of the Rizzuto-Marciano driveway and the right-of-way to the beach to be based upon the plaintiffs' compromise agreed location also shown on appendix two. The decreed location of the driveway and the right-of-way is shown on appendix two as the area bounded by points one, two, three and four. The trial court explained the permissible uses of the right-of-way; ordered the defendants to remove their fence; ordered the defendants to pay the plaintiffs' attorney's fees and expenses including surveying fees; awarded Marciano and Rizzuto $15,400 as compensation for loss of rental income while the defendants blocked the right-of-way with their fence; and awarded the Flanagans $1,000 as "nominal damages" for the encroachment of the defendants' garage onto the Flanagans' back lot.

## I. Resolution of the East-West Prudhomme-Flanagan Boundary

■■ To prevail on appeal, the defendants must show that the trial court's determination of the disputed boundaries was unsupported by the evidence or was erroneous as a matter of law. *MacNeil v. Brownell*, 133 N.H. 184, 187, 574 A.2d 1375, 1377 (1990). The interpretation of deeds in a quiet title dispute is ultimately to be resolved by this court. *Seward v. Loranger*, 130 N.H. 570, 574, 547 A.2d 207, 210 (1988). Our determination of disputed deeds is based on the parties' intentions gleaned from construing the language of the deed

from as nearly as possible the position of the parties at the time of the conveyance and in light of surrounding circumstances. *Robbins v. Lake Ossipee Village,* 118 N.H. 534, 536, 389 A.2d 940, 942 (1978).

■■ The defendants argue that the trial court's order and decree of the boundaries is flawed because it is based upon evidence extrinsic to the deeds when, they argue, at least one relevant deed is unambiguous. Extrinsic evidence of the parties' intentions and the circumstances surrounding the conveyance may be used to clarify the terms of an ambiguous deed. *Quality Discount Market Corp. v. Laconia Planning Bd.,* 132 N.H. 734, 740, 571 A.2d 271, 274–75 (1990); *Locke Lake Colony Assoc. v. Town of Barnstead,* 126 N.H. 136, 139, 489 A.2d 120, 122 (1985). A deed is patently ambiguous when the language in the deed does not provide sufficient information to adequately describe the conveyance without reference to extrinsic evidence. *Locke Lake,* 126 N.H. at 139, 489 A.2d at 122; *Ouellette v. Butler,* 125 N.H. 184, 188, 480 A.2d 76, 79 (1984). A latent ambiguity exists when the language in the deed is clear, but the conveyance described can be applied to two different subjects or is rendered unclear by reference to another document. *MacKay v. Breault,* 121 N.H. 135, 139, 427 A.2d 1099, 1101 (1981); *see also In re Estate of Sayewich,* 120 N.H. 237, 242, 413 A.2d 581, 584 (1980).

In this case, the Prudhommes' and the Flanagans' deeds are the beginning points for locating the east-west boundary between their lakefront properties. The Flanagans bought their property from Mildred Kelley, Joyce Flanagan's mother, in 1976. Their deed describes a lot with boundaries beginning at the lake shore at the land of John Colby (lot E on appendix one); then running westerly to the "Latti Farm, so-called"; then turning at a right angle and continuing thirty feet southerly; again turning at a right angle and running easterly to the shore of the lake; then turning northerly thirty feet along the shore to the beginning point. The Prudhommes' property was conveyed in two tracts from the Plumers. Tract one (lot B on appendix one) is described in the deed as a parcel with fifty feet of shore frontage and a depth of 130 feet, and named the southern abutter as the land of S. O. Huckins (lot A on appendix one). The deed description of the boundaries of tract two begins at a point on the shore of the lake thirty feet south of the "land formerly of John Colby"; the boundary then runs west to the "Latti Farm, so-called"; then turns at right angles and runs thirty feet on the western border to "land formerly of Dorothy Reith [*sic*]"; then again turns at a right angle and runs east along the former Rieth property to the shore; and then runs north thirty feet along the shore to the beginning point.

The evidence at trial established that the Colby land, which later became the Kelleys' property and is designated as lot E on appendix one, can be fixed by reference to an existing granite monument in the northwest corner of the property. Once that point is located, the Flanagans' lot and the Prudhommes' tract two, each described with thirty feet of lake frontage and referencing the Colby land, can be situated as contiguous lakefront lots. Also, the Prudhommes' tract one, with fifty feet of frontage and abutting the land formerly of S. O. Huckins, can be located. When those lots are plotted on the ground as described by their distance calls, however, an unexpected fifty-foot gap appears between the two tracts of the Prudhommes' property. As a result, the southern boundary of the Prudhommes' tract two that is described in its deed as abutting land formerly of Dorothy Rieth would actually abut the gap, rather than abutting tract one, which was the land formerly of Rieth.

The Prudhommes' and Flanagans' chains of title reveal the source of the problem. The Prudhommes' tract two and the Flanagans' lakefront lot were subdivided in 1954 from a single tract owned by Dorothy Rieth. At that time, Rieth conveyed two lots of the same size, on the same day, one to the Plumers and one to the Kelleys, who were the Prudhommes' and the Flanagans' predecessors in title. Each lot was described in its deed as being thirty feet wide and a portion of the property conveyed to Rieth by Walter Robinson in 1936.

Robinson had originally owned all of the property, described as 160 feet wide along the lake, that subsequently became the Prudhommes' two tracts and the Flanagans' lot. In 1929, Robinson sold a single lot, fifty feet wide, to Rieth, which she conveyed to the Plumers in June 1954, and which the Plumers sold to the Prudhommes in 1987 as tract one. In 1936, Robinson conveyed a second piece of property to Rieth that the deed described as being only sixty feet wide. The deed named abutters, however, that required the property to extend 110 feet from Rieth's first lot on the south to the land of John Colby on the north. No record of other conveyances of the property by Robinson was found. Therefore, the property sold in 1936 by Robinson to Rieth was either 110 feet wide, as described by the abutter calls, or sixty feet wide, as described by the distance call.

If the conveyance was, in fact, only sixty feet wide, and the abutter calls were erroneous, then there was another lot, fifty feet wide, between Rieth's two properties that Robinson never conveyed. On the other hand, if the distance call of sixty feet was erroneous, and the abutter calls were correct, then Robinson actually sold Rieth a lot 110 feet wide rather than sixty feet wide, and the "extra" fifty feet

are resolved. The conflict between the distance and abutter calls began in the deed for the conveyance from Robinson to Rieth, and was repeated in the deeds for the subsequent conveyances from Rieth to the Plumers and the Kelleys, and then to the Prudhommes and the Flanagans. Because both the Prudhommes' tract two lot and the Flanagans' lot were subdivided from the Rieth property with uncertain width, both the Prudhommes' and the Flanagans' deeds contain latent ambiguities as to what property was intended to be conveyed through their predecessors in title from Rieth.

Our decision in *Sorenson v. Wilson*, 124 N.H. 751, 476 A.2d 244 (1984), does not suggest a different result, as urged by the defendants. In *Sorenson*, the plaintiffs petitioned to quiet title to two parcels of land that were also claimed by the defendant based on the parties' interpretations of their separate chains of title. *Id.* at 754-55, 476 A.2d at 246. We stated the rule that "[a] deed which describes the land to be conveyed precisely and without ambiguity can only be construed as conveying the land described and nothing more or less." *Id.* at 755, 476 A.2d at 246. We found that the descriptions of property in the original deeds in the defendant's chain of title were consistent with the property described in his present deeds and that neither included the disputed property. Therefore, the deeds sufficiently expressed the parties' intent as to the property conveyed despite other conveyances to the defendant's intermediate predecessors in title. *Id.* Consequently, we reversed the trial court's determination that the defendant held title to the two disputed parcels, and remanded the case for a new trial to determine the plaintiffs' rights to the property as against all other interested parties. *Id.* at 758, 476 A.2d at 247.

■ The parties in *Sorenson* disputed title to the properties, but did not raise a question as to the actual location of the properties. Further, title could be readily determined from the face of the deeds in the parties' chains of title. In this case, however, although the descriptions of the tracts in the deeds appear to be clear, the property cannot be located on the ground, exactly as described, due to the inconsistencies between the abutter calls and the distances. Therefore, the trial court properly considered extrinsic evidence to resolve the ambiguity as to the intent of the parties in making the conveyances.

The Prudhommes also argue that the trial court improperly allowed hearsay in the testimony of Mildred Kelley concerning Clifton Plumer's statements about his property boundary. The trial court ruled that Kelley's testimony was admissible under the hearsay ex-

ception for admissions against interest by an unavailable declarant. N.H. R. Ev. 804(b)(3). Because the defendants, in their brief, mention their objection to the May deposition testimony only in passing and without specifying which statements were hearsay, we will not address that testimony separately. *See State v. Hermsdorf*, 135 N.H. 360, 365–66, 605 A.2d 1045, 1048 (1992).

We will not disturb the trial court's ruling on the admissibility of evidence as an exception to the hearsay rule unless we find the decision to have been clearly erroneous. *State v. Killam*, 137 N.H. 155, 160, 626 A.2d 401, 404 (1993). Although the Prudhommes do not dispute that Plumer was unavailable to testify at trial, they argue that the trial court's ruling allowing Kelley's testimony was legally erroneous because the plaintiffs failed to show that they were unable to obtain Plumer's testimony by other reasonable means. *See* N.H. R. Ev. 804(a)(5). The plaintiffs rely on Rule 804(a)(4), which states that "unavailability as a witness" includes being "unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." Rule 804(a) provides five situations in which a declarant may be found to be unavailable to testify at trial. N.H. R. Ev. 804 reporter's notes. The five situations are joined by "or" indicating that each is an alternative circumstance for showing unavailability. Therefore, the obligation to attempt to procure an unavailable witness's attendance or testimony by reasonable means imposed by Rule 804(a)(5) does not apply to the situation of unavailability described in Rule 804(a)(4).

█ When the Prudhommes' attorney objected to the anticipated testimony as hearsay, the plaintiffs' attorney explained that Plumer was unavailable because he was in the hospital in Georgia. There was no further discussion of Plumer's availability. Based on the record, we cannot say that the trial court clearly erred in finding that Plumer was unavailable.

The Prudhommes next contend that the hearsay exception provided in Rule 804(b)(3) does not apply to Plumer's statements about his boundary because Plumer's statements were not sufficiently against his interest to be trustworthy. Rule 804(b)(3) uses an objective test for determining whether statements are against the declarant's interest, although the trial court is not precluded from considering evidence of the declarant's subjective state of mind. *State v. Kiewert*, 135 N.H. 338, 343–44, 605 A.2d 1031, 1034–35 (1992). A statement is sufficiently against the declarant's interest to be trustworthy and an exception to hearsay if "'the interest injured or the burden imposed by the facts stated should be one so palpable

and positive that it would naturally have been present in the declarant's mind.'" N.H. R. Ev. 804(b)(3) reporter's notes (quoting *Rau v. Stores*, 97 N.H. 490, 494, 92 A.2d 921, 923 (1952) (brackets omitted)). Long before the New Hampshire Rules of Evidence were adopted, statements about boundaries made by persons who were unavailable at trial were recognized as declarations against interest and as a separate hearsay exception. *See Tuftonboro v. Willard*, 89 N.H. 253, 257–58, 197 A. 404, 407 (1938).

Plumer's interest in his property boundary, particularly considering the small size of his lot and the close proximity of the cottages in the area, was a "palpable and positive" interest that he would naturally have had in mind when he made statements about the boundary to his neighbor. Consequently, Plumer's statements about his boundary were sufficiently against his interest in his property to be trustworthy and a hearsay exception under Rule 804(b)(3). The trial court's ruling allowing Kelley's testimony about Plumer's statements concerning the location of their mutual boundary was not clearly erroneous.

We agree with the trial court that the evidence clearly and convincingly shows that an east-west boundary must be decreed between the Flanagans' and the Prudhommes' lots to properly reflect the intentions of the parties to the original conveyance. *See Chabot v. Shiner*, 95 N.H. 252, 255, 61 A.2d 791, 793 (1948); *Searles v. Churchill*, 69 N.H. 530, 43 A. 184 (1898). In general, boundaries established by abutter calls take precedence over distance calls. *In re Estate of Sayewich*, 120 N.H. at 243, 413 A.2d at 584; *Cunningham v. Curtis*, 57 N.H. 157, 159 (1876). Further, uncertainty or ambiguity in deeds must be resolved in favor of the grantee and against the grantor. *Kennett Corporation v. Pondwood Co.*, 108 N.H. 30, 34, 226 A.2d 783, 786 (1967). As a result, the tract sold by Robinson to Rieth in 1936, which is described in the deed as being sixty feet wide, should have been described as 110 feet wide to cover the distance described by the abutter calls in the deed.

The evidence supports the conclusion that Robinson intended to convey the entire lot to Rieth. Research done by the parties' surveyors found no conveyance of the additional fifty feet by Robinson, suggesting that he intended to convey all 110 feet to Rieth rather than only the sixty feet described in the deed. There was no evidence that Rieth or Plumer understood that the property consisted of two tracts separated by another lot. Stephen Prudhomme testified that Plumer told him that his lot had 100 feet of lake frontage, and he

understood that the property he bought was one piece, not two lots separated by a lot that was not conveyed to him. Consequently, the trial court found that the two deeds in 1954 from Rieth to the Plumers and to the Kelleys conveyed the entire lot that she had acquired from Robinson in 1936. The parties intended each of the two lots sold by Rieth to the Plumers and the Kelleys to contain half of the property subdivided. Therefore, each of the two lots should have been described as being fifty-five feet wide rather than thirty feet wide.

When the Plumers and the Kelleys each bought one of the two lots from Rieth, Plumer explained to the Kelleys that their mutual boundary would be thirty feet beyond his original northern boundary or thirty-six feet from his side porch. The trial court found that the Plumers and the Kelleys had agreed on the boundary as described by Plumer, but ordered the east-west boundary between the Flanagans' and the Prudhommes' lots to be located along a compromise line, based on the boundary proposed by the plaintiffs, which was close to the agreed boundary while avoiding the Prudhommes' house.

Except for the east-west boundary between the Flanagans' and the Prudhommes' properties, the trial court generally adopted the boundaries on the survey map made by the Great East Land Survey Company. We concur with the trial court that the survey accurately maps the boundaries, but we disagree with the east-west boundary as decreed by the trial court. The evidence presented at trial demonstrates, and the trial court found, that the ambiguity in the deeds as to the width of the tract conveyed from Robinson to Rieth, subsequently subdivided between the Plumers and the Kelleys, and then conveyed to the Prudhommes and the Flanagans, caused a misunderstanding as to the width of the resulting lots. The result was that the Plumers and the Kelleys mistakenly thought that they each owned a lot only thirty feet wide, rather than fifty-five feet wide, and agreed to a boundary thirty feet beyond the Plumers' original boundary. Consequently, the agreed boundary was based on the same mutual mistake of fact about the width of the property that has been perpetrated in the erroneous deed descriptions of the Prudhommes' and the Flanagans' lots.

■ The trial court alternatively relied on the doctrine of adverse possession to support the location of the boundary. To prove adverse possession, the claimants must show that they or their predecessors have achieved "twenty years of adverse, continuous, uninterrupted use of the land claimed so as to give notice to the owner that an

adverse claim is being made." *Kellison v. McIsaac*, 131 N.H. 675, 678, 559 A.2d 834, 836 (1989). Adverse use constitutes a trespass that the legal owner can prevent or obtain compensatory damages through legal action. *Zivic v. Place*, 122 N.H. 808, 815, 451 A.2d 960, 963 (1982).

When the Plumers and the Kelleys first owned their properties, the area between what is now the Prudhommes' and the Flanagans' properties was wooded and wet due to seasonal runoff. The wet area was used by the Kelley children and other children, including children of the Plumers' tenants, who occasionally played in the area. The minimal use of the area by children was neither exclusive of the Plumers nor was it adverse to their interests. Twenty years has not elapsed since the Flanagans bought their lot in 1976 and began to fill the wet area between the properties. Therefore, we find no support for the trial court's reliance on adverse possession to establish the location of the boundary between the Prudhommes' and the Flanagans' properties.

We conclude that the east-west boundary between the Flanagans' and the Prudhommes' properties as shown on the survey made by Great East Land Survey Company is the boundary originally intended by the parties when the lots were subdivided from Rieth's property, but for their mutual mistake about the width of the property subdivided into the two lots. The east-west boundary between the Flanagans' and the Prudhommes' properties is shown on appendix two as the line between points five and six. The Flanagans' lakefront lot and the Prudhommes' tract two should each be fifty-five feet wide as shown by the survey. Therefore, the Prudhommes' and Flanagans' deeds are to be reformed to correct the mistake as to the width of the lots and the location of the boundary between the lots. Because the parties have not contested, on appeal, the location of the Rizzuto-Marciano driveway or the boundaries of the driveway strip, we do not address that property or its boundaries.

*II. Location and Use of the Right of Way to the Lake*

The property owned by Marciano and Rizzuto has access to the lake only by a deeded right-of-way. Access to the lake was first provided by a path that was created by the Plumers, the Prudhommes' predecessors in title, and the Mays, Rizzuto's and Marciano's predecessors in title, in 1962, by filling a pathway with gravel through a wet area across the Plumers' property. The path provided access to the lake for the Mays, who then owned the lot now owned by Rizzuto

and Marciano. Use of the path to the lake continued by permission of the Plumers even after the Mays sold their property in 1972. After the sale of the Mays' property, an error was discovered in the deed that required a second deed, in 1979, from the Mays and the Plumers to the new owners, and the 1979 deed included, for the first time, a separately deeded right-of-way to the lake. After 1979, the owners of the property, which Marciano and Rizzuto purchased in 1984, continued to use the same path as the deeded right-of-way until 1988 when the path was obstructed by the Prudhommes' stockade fence, and subsequently, by part of their new house.

The interpretation of a deeded right-of-way is ultimately a question of law for this court to decide by determining the intention of the parties at the time of the deed in light of surrounding circumstances. *Dumont v. Town of Wolfeboro*, 137 N.H. 1, 5, 622 A.2d 1238, 1241 (1993); *Thurston Enterprises, Inc. v. Baldi*, 128 N.H. 760, 765, 519 A.2d 297, 301 (1986). If the language of the deed is clear and unambiguous, we will interpret the intended meaning from the deed itself without resort to extrinsic evidence. *Lussier v. N.E. Power Co.*, 133 N.H. 753, 756–57, 584 A.2d 179, 181 (1990). When Marciano and Rizzuto purchased their property, their deed described the right-of-way as being "eleven (11) feet wide extending from TRACT 3 herein described, next the line of Kelley land to the lake shore, said right of way crossing the northerly portion of the land conveyed to said Plumers by Dorothy Rieth. . . ." In terms of the present property owners, the deed states that the right-of-way is to be located along the Prudhommes' and Flanagans' east-west boundary. We have determined their boundary to be in a different location than the property owners understood when the original path was created and when the right-of-way was described in the deed. Consequently, the path that was used as the right-of-way to the lake and that the Prudhommes blocked with their fence is not next to the Prudhommes' and Flanagans' east-west boundary as we have determined it. Further, the area where the right-of-way would be, if it were located next to the boundary as we have determined it, is obstructed by brush, trees and a drainage culvert.

When a deeded right-of-way is obstructed or impaired by the conduct of the owner of the servient estate, the owner of the dominant estate may deviate from the deeded right-of-way in order to preserve the right granted as long as the proposed deviation is not unduly burdensome to the servient estate. *Dumont*, 137 N.H. at 5–8, 622 A.2d at 1241–42. The plaintiffs proposed a compromise right-of-way, along with a compromise boundary between the Prudhomme

and Flanagan properties, which the trial court substantially adopted. The court noted that its decision was warranted by its view of the property. Under these circumstances and giving due deference to the trial court's factual findings, particularly based on its view of the property, *see Delaney v. Gurrieri*, 122 N.H. 819, 822, 451 A.2d 394, 396 (1982), we conclude that the right-of-way should be located based on the plaintiffs' proposed compromise route as ordered by the trial court. The location of the right-of-way, as found by the trial court is amply supported by the evidence presented at trial.

■ Having affirmed the location of the right-of-way, we now review the scope of use as decreed by the trial court and challenged on appeal by the Prudhommes. The applicable deed grants a right-of-way to Marciano and Rizzuto to cross the Prudhommes' property to the lake shore without restrictions. An unrestricted right-of-way is subject to a determination of reasonable use. *Dumont*, 137 N.H. at 5-6, 622 A.2d 1242; *Sakansky v. Wein*, 86 N.H. 337, 339, 169 A. 1, 2 (1933). When the uses of a deeded right-of-way are not specified or restricted in the deed, "[t]he uses to which easements may be put are questions of fact to be arrived at by considering all of the surrounding circumstances, including location, the uses of both parties' properties and the advantage of one owner's use and the disadvantage to the other owner caused by that use." *Downing House Realty v. Hampe*, 127 N.H. 92, 96, 497 A.2d 862, 865 (1985) (citations and quotations omitted); *see Delaney*, 122 N.H. at 821, 451 A.2d at 396. The trial court may consider extrinsic evidence when asked to determine the extent and reasonable use of a right-of-way. *Burcky v. Knowles*, 120 N.H. 244, 248, 413 A.2d 585, 588 (1980).

■ Based on evidence of past practice by the parties and their predecessors in title, the trial court decided that the scope of use included maintaining a dock and mooring a boat in the lake at the end of the right-of-way. The evidence established that other owners of the property served by the right-of-way, now owned by Marciano and Rizzuto, had maintained a seasonal dock and moored a boat at the end of the right-of-way. To prevail, the Prudhommes must show that the allowed uses of the right-of-way by the owners of the dominant estate unreasonably interfere with the Prudhommes' possessory interest in the servient estate. That they have not done. We will not overturn the factual findings of the trial court, particularly when aided by a view of the property in question, when they are supported by the evidence. *Delaney*, 122 N.H. at 822, 451 A.2d at 396. Accordingly, the trial court's determination of the scope of use of the right-of-way is affirmed.

### III. Damages Awarded for Loss of Rental Income

The trial court awarded Marciano and Rizzuto compensatory damages in the amount of $15,400 for the loss of rental income from their cottage for the rental seasons of 1989 through 1992. On appeal, the Prudhommes contend that the award was erroneous because Marciano and Rizzuto failed to mitigate their damages and because the award should have been decreased by the benefit of Marciano's and Rizzuto's own use. Marciano and Rizzuto counter, arguing that because the Prudhommes acted with reckless disregard of their interests in the right of way to the beach, they were entitled to recover for lost rental income whether or not they attempted to mitigate their damages. Further, they argue, mitigation was not possible under the circumstances.

As a general rule, plaintiffs may not recover damages for harm that could have been avoided through reasonable efforts or expenditures. *Smith v. Cote*, 128 N.H. 231, 243–44, 513 A.2d 341, 349 (1986); *Emery v. Caledonia Sand and Gravel Co.*, 117 N.H. 441, 448, 374 A.2d 929, 934 (1977). An exception may be allowed when the party causing harm acted intentionally or with reckless disregard for the plaintiff's interests. *See* RESTATEMENT (SECOND) OF TORTS § 918 (1977). Even in that circumstance, however, the plaintiff cannot intentionally or heedlessly fail to protect his or her own interests. *Id.*

Plaintiff Marciano testified that she and co-owner Rizzuto were unable to rent their cottage after the summer of 1988, when the path to the beach was obstructed by the Prudhommes' fence. There was no longer access to the beach because the space designated by the Prudhommes as the right of way was unusable due to trees, brush and the location of the drainage culvert. During that time, Marciano and Rizzuto used their cottage and visited the beach by crossing the Flanagans' property, with their permission, and then by walking to the area of the beach assigned to them by the Prudhommes, which was not the area they had previously used. Marciano further testified that they could not provide tenants in their cottage with access to the lake across the Flanagans' property because of the inconvenience for the Flanagans.

The Prudhommes presented no evidence to show that the cottage was rentable, to contradict the plaintiffs' evidence of the lost rental value of the property, or to value the plaintiffs' use of the property. Consequently, the Prudhommes have not carried their burden of proof of showing that the plaintiffs failed to mitigate their damages. *Parem Contracting Corp. v. Welch Const. Co., Inc.*, 128 N.H.

254, 259, 512 A.2d 1104, 1107 (1986); *Eno Brick Co. Inc. v. Barber-Greene, Co.*, 109 N.H. 156, 160, 245 A.2d 545, 548 (1968). Further, the trial court's order stated that the award of lost rental income to Marciano and Rizzuto was based on both the egregious conduct of the Prudhommes in blocking the right-of-way path and the court's view of the property. Based on the record, we cannot say that the trial court's award of damages was erroneous.

### IV. Award of Attorney's Fees

The trial court, finding egregious behavior by the Prudhommes, awarded attorney's fees to the plaintiffs. An award of attorney's fees is the exception rather than the rule and requires "statutory authorization, an agreement between the parties, or an established exception." *Maguire v. Merrimack Mutual Ins. Co.*, 133 N.H. 51, 55, 573 A.2d 451, 453 (1990). We infer that the trial court relied on the exception for parties who are "forced to litigate against an opponent whose position is patently unreasonable." *Keenan v. Fearon*, 130 N.H. 494, 502, 543 A.2d 1379, 1383 (1988); *see also St. Germain v. Adams*, 117 N.H. 659, 662, 377 A.2d 620, 623 (1977). Because we have found the boundary between the Prudhommes' and the Flanagans' properties difficult to determine and because we have resolved the ambiguity differently than did the trial court, we cannot agree with the trial court that the Prudhommes' defense of the property line disputes was patently unreasonable. *See Dumont*, 137 N.H. at 11, 622 A.2d at 1244. Although their conduct toward their neighbors may have been vexatious and egregious, we look only to their conduct in the litigation and find nothing to support the conclusion that their defense was frivolous. *See King v. Mosher*, 137 N.H. 453, 457, 629 A.2d 788, 791 (1993). Consequently, we hold that the trial court abused its discretion, and we reverse the award of attorney's fees to the plaintiffs. *See Guaraldi v. Trans-Lease Group*, 136 N.H. 457, 462, 617 A.2d 648, 651 (1992).

### V. Garage Encroachment and Award of Nominal Damages

The trial court found that the Prudhommes' garage encroached into the Flanagans' back lot and awarded the Flanagans $1000 as nominal damages. The Prudhommes argue that the evidence does not support the court's finding of encroachment. We will uphold the factual findings of the trial court unless they are unsupported by the evidence. *MacNeil v. Brownell*, 133 N.H. at 187, 574 A.2d at 1378. Although the Prudhommes' survey shows no encroachment, the plaintiffs' surveyor testified that even giving the Prudhommes the

benefit of the doubt on the depth of their lot, the garage encroaches by a few inches for a length of seven to eight feet. In addition, the trial court saw the property in question during its view. Therefore, there was sufficient evidence of an encroachment to support the trial court's finding.

■■■ Although the trial court labeled its award of $1000 to the Flanagans as nominal damages, the court may have intended compensatory damages based on the circumstances and the amount of the award. *Cf. Pugliese v. Town of Northwood*, 119 N.H. 743, 751, 408 A.2d 113, 118 (1979) (holding that nominal damages that were not compensatory should be awarded only in the smallest appreciable amount). Because the amount awarded was more than the smallest appreciable amount, we remand to the trial court to determine whether the $1000 was intended to be compensatory or, if not, for a determination of proper nominal damages.

*VI. Award of Expert Witness Costs*

■■■ The trial court awarded the plaintiffs, as the prevailing party, their surveying fees and expenses. The Prudhommes object, arguing that the plaintiffs are entitled only to the costs charged by the plaintiffs' surveyor for appearing and testifying in court. Superior Court Rule 87(c) provides in pertinent part:

"The court, in its discretion, may allow . . . other costs including, but not limited to, actual costs of expert witnesses, if the costs were reasonably necessary to the litigation."

We construed "actual costs" under RSA 525:14-a (1974) (repealed 1989), which controlled the award of costs for expert witnesses before the adoption of Rule 87, as not including all fees paid to expert witnesses, but instead being limited to those charges directly related to the witness's appearance and testimony in court. *Cutter v. Town of Farmington*, 126 N.H. 836, 843–44, 498 A.2d 316, 322 (1985); *State v. Wilson*, 115 N.H. 99, 102, 333 A.2d 459, 462 (1975). The same limitation on "actual costs" of expert witnesses also applies to Rule 87(c). The trial court directed the parties either to agree to the proper amount for costs or to submit written itemized statements to the court for determination. If the parties can now agree as to the proper amount of expert witness costs to be paid by the Prudhommes to the plaintiffs, we encourage that result. In any case, we remand the question of appropriate costs to the trial court to determine which surveying fees are properly allowable under Rule 87(c).

In summary, we reverse the trial court's determination of the east-west boundary between the Flanagans and the Prudhommes, the

award of nominal damages to the Flanagans, and the award of attorney's fees and expert witness costs to the plaintiffs. We remand the case to the trial court to set the east-west boundary between the Flanagans and the Prudhommes for purposes of reforming the affected deeds, to clarify the award of $1000 to the Flanagans, and to determine appropriate costs, if not agreed by the parties, all in a manner consistent with this opinion. We affirm the trial court's location and use of the right-of-way to the lake, and the award of $15,400 as damages for loss of rental income to Rizzuto and Marciano.

*Affirmed in part, reversed in part, remanded.*

All concurred.

APPENDIX ONE

APPENDIX TWO

580

N/F CLIFTON O. & RUTH B. PLUMER

N/F ROCCO J. RIZZUTO & KATHLEEN MARCIANO
926/482   1984
TRACT 3

MICHAEL A. & JOYCE FLANAGAN
626/257   1976

1 story wood frame dwelling

2 story wood frame dwelling