Carroll
No. 2008-512

DANA DUXBURY-FOX

v.

EUGENE SHAKHNOVICH & a.

Argued: April 7, 2009
Opinion Issued: September 18, 2009

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the petitioner.

*Cooper Cargill Chant, P.A.*, of North Conway (*Randall F. Cooper* and *Christopher T. Meier* on the brief, and *Mr. Cooper* orally), for the respondents.

HICKS, J. The respondents, Eugene and Marsha Shakhnovich, appeal an order of the Superior Court (*Fitzgerald*, J.) ruling that the petitioner, Dana

Duxbury-Fox, and the third-party respondents, Mrs. Benjamin Earle, W.R. and M.M. Amundsen Rev. Trust, Warren and Mary Amundsen, Trustees, Marion Sokolov, Lawrence J. Walsh, Jane S. Walsh and Ivan Sokolov (the campers), have an appurtenant easement to use a fifty-foot right-of-way over the respondents' land. We affirm.

The following facts were found by the trial court or are supported in the record. All parties own land on Lower Beech Pond in Tuftonboro that was once part of a larger parcel owned by Charles H. Brown. Charles H. Brown subdivided a portion of the parcel into five lots, each of which had shore frontage on the pond but was landlocked, in terms of road access, by the remaining portion of the parcel he retained. One of the five lots is now owned by the petitioner; the others are owned by the campers.

The chain of title to the petitioner's lot originates in two deeds, dated October 1, 1927, and September 8, 1930, from Charles H. Brown to the petitioner's grandfather, Robert Craig. The 1927 deed contained the following language: "Permission is hereby given for said grantee to pass and repass over land of said grantor to lot above mentioned." The 1930 deed stated: "It is understood and agreed that the said Robert Craig, his heirs and assigns, shall have the right to pass and repass over the land of said grantor." Historically, the petitioner and the campers accessed their property two ways: (1) by boat via a portion of Charles H. Brown's remaining land known as "Sandy Beach"; and (2) by a footpath over a different portion of the grantor's land (the overland right-of-way).

Charles H. Brown passed away in 1951. By deed dated March 11, 1961, his widow conveyed a portion of his remaining property, including Sandy Beach, to Harold Brown. In 1971, Harold Brown had a subdivision plan approved by the Tuftonboro Planning Board and recorded in the registry of deeds. It depicted a parcel he had previously conveyed to Paul E. and Eleanor E. Snow, a lot he subsequently conveyed to Alden Ringer (which included Sandy Beach), and a fifty-foot right-of-way. After approval of the subdivision plan, the campers stopped using Sandy Beach and began using the right-of-way depicted on the plan. In 1973, the campers constructed a gravel driveway and parking area in the fifty-foot strip. They also installed a dock in the pond.

When Harold Brown died in 1972, his property passed to his widow, Ethelyn Brown. She conveyed the fifty-foot right-of-way to her son, Charles E. Brown on July 18, 1987. The deed, drafted by a non-lawyer, stated:

> This parcel is designated as Map 069 Parcel 001 Lot 013 in the Town of Tuftonboro Tax Records, and was approved by the Tuftonboro Planning Board on June 16, 1971, when the neighboring lot was being purchased by the Ringers.

Some western shore owners (Lower Beach [*sic*] Pond) with limited access to their lots, have been permitted use of this 50 foot wide area in order to reach the Pond from Brown Road (Lawrence Walsh, Ruth Mills, Trygve Amundsen and Messrs, Sokolov and Earle).

At some point, the Snow lot was conveyed to the Beards, who built a house. In order to correct a set back violation created by the construction of their house, the Beards purchased the fifty-foot strip from Charles E. Brown. The deed repeated the same language contained in the deed from Ethelyn to Charles E. Brown.

In 2004, the respondents bought the Beard property and in 2005, they informed the petitioner and the campers that they had been granted only a license to use the right-of-way and that the respondents were terminating the license. The petitioner then commenced this action to quiet title and for injunctive relief.

The trial court ruled that the 1927 and 1930 deeds from Charles H. Brown to Robert Craig created an appurtenant easement rather than a license. The court concluded:

[T]he petitioner and the campers have an appurtenant easement to use the fifty-foot right-of-way as outlined in the [Tuftonboro] Planning Board's subdivision plan of 1971. The petitioner and the campers may use the right-of-way for parking motor vehicles, storage of boat trailers, and landing, loading, and unloading of boats at the dock or on the shore.

On appeal, the respondents argue that the trial court erred in: (1) finding the 1927 and 1930 deeds to Robert Craig ambiguous and admitting extrinsic evidence; (2) "interpreting the deeds to afford [the petitioner] any right over the Subject Parcel, rather than a separate overland right of way"; (3) "finding that the Subject Parcel may be burdened by an easement not found in its chain of title, but rather language offering permission to specified individuals"; and (4) sanctioning the petitioner's expansion of the alleged easement. We will address these arguments in turn.

■ "The interpretation of deeds in a quiet title dispute is ultimately to be resolved by this court." *Harvey v. Hsu*, 144 N.H. 92, 93 (1999) (quotation omitted). "Our determination of disputed deeds is based on the parties' intentions gleaned from construing the language of the deed from as nearly as possible the position of the parties at the time of the conveyance and in light of surrounding circumstances." *Id.* (quotation omitted). "A deed is patently ambiguous when the language in the deed does not provide sufficient information to adequately describe the conveyance without

reference to extrinsic evidence." *Flanagan v. Prudhomme*, 138 N.H. 561, 566 (1994). When such ambiguity exists, "[e]xtrinsic evidence of the parties' intentions and the circumstances surrounding the conveyance may be used to clarify the [deed's] terms." *Id.*

The trial court found the language of the 1927 and 1930 deeds ambiguous as to whether the grant of an easement or a license was intended. After considering extrinsic evidence, the court concluded that the language in those deeds "creates two distinct tenements in which a dominant estate is benefited by use of an easement on a servient estate." With respect to those original deeds, the respondents do not challenge the finding that an easement was intended, but rather dispute the easement's location.

The respondents first point to language in the original deeds granting a right to " 'pass and repass over the land of [Charles H. Brown]' " and contend that it unambiguously refers to a right-of-way solely over land; specifically, the overland right-of-way. They argue that the deeds do *"not* refer to a passage over land to the water, or even over land then water to the petitioner['s] lot[], and therefore cannot be ambiguous as to whether this grant could refer to the Respondent[s'] land which only makes access to the water possible." We disagree, as we find the language "over the land" neither dispositive nor unambiguous.

■ We take judicial notice that Lower Beech Pond is a state-owned body of water, *see Official List of Public Waters* (DES 1990, revised 2007), *available at http://des.nh.gov/organization/commissioner/pip/publications/ wd/documents/r-wrd-91-4.pdf*, and that no "individual shall have or exercise in any such body of water any rights or privileges not common to all citizens of this state." RSA 271:20 (1999). Accordingly, Charles H. Brown could not have granted the petitioner a right-of-way over the water and even a means of access via the water could only be granted as an overland easement. We conclude that because the 1927 and 1930 deeds do not "adequately describe," *Flanagan*, 138 N.H. at 566, where the grantees may "pass and repass" over the grantor's land, they are ambiguous with respect to the location of the easement granted. The trial court therefore properly admitted extrinsic evidence to interpret those deeds. *Id.*

■ ■ The respondents next argue that even considering extrinsic evidence, the 1927 and 1930 deeds do not grant the petitioner a right-of-way over the respondents' land to access her lot by water. The respondents assert that "by the admission of certain of the Petitioner's witnesses themselves, most notably Judge Walsh, the grant in the original deeds referred to the footpath passage over land, not over water and the Respondent's land." Admittedly, Walsh, who is one of the campers and a retired attorney and district court judge, opined that the right-of-way

granted in his deed was one over land. To the extent Walsh's testimony may be read to express an opinion on the interpretation of the easement granted in the original deeds as well as his own deed, that is an opinion upon the ultimate issue before the court. Walsh was not certified as an expert, and even if he had been, his opinion would not have been binding upon the court, which was just as capable of interpreting the deeds based upon the evidence. While Walsh could certainly testify as to factual matters regarding, for instance, historical means of access, his interpretation of the deeds in question expressed an opinion upon an issue of law. *See Motion Motors v. Berwick*, 150 N.H. 771, 775 (2004) ("The proper interpretation of a . . . deed[] is a question of law for this court."). "A witness . . . may not ordinarily give an opinion regarding a matter of law." *Cyr v. J.I. Case Co.*, 139 N.H. 193, 199-200 (1994). Accordingly, the trial court was not compelled to adopt the "admission" of Walsh or any other witness as to the proper interpretation of the original deeds.

■ We conclude that the trial court's location of the easement granted in the 1927 and 1930 deeds is both correct as a matter of law and supported by the evidence. "Defining the rights of the parties to an expressly deeded easement requires determining the parties' intent in light of circumstances at the time the easement was granted." *Dumont v. Town of Wolfeboro*, 137 N.H. 1, 5 (1993). "[I]n the case of a grant of an undefined way, as, for example, the right to pass and repass across the grantor's [land,] . . . [i]f the parties cannot agree, equity determines the location of the way." *White v. Hotel Co.*, 68 N.H. 38, 43 (1894). Where the "location and limits of the reserved way are not specified[,] [i]t is a reservation of a reasonably convenient and suitable way across the granted land to the place or places mentioned." *Gardner v. Webster*, 64 N.H. 520, 522 (1888). This rule is neither arbitrary, nor a deviation from our task to determine the parties' intent; it rests upon the presumption that "a reasonably convenient and suitable way" is, in fact, what the parties intended. *Id.* As we explained in *Gardner*: "It is improbable that two men have understandingly entered into a bargain which contains a stipulation plainly and clearly to the disadvantage of both. . . . The language of their deed is to be read in the light of this improbability." *Id.* Thus, "[t]he convenience of both parties is evidence of the locality of" a disputed right-of-way, *id.*, and "[t]he benefit to one party or injury to the other of a particular construction may be of decisive weight in determining whether it was intended," *id.* at 521.

■ The petitioner, Charles E. Brown, Walsh and Morrison all testified that the landlocked parcels historically have been accessed by a footpath and by boat. The testimony indicated, however, that access has been primarily by boat. An explanation for the relative infrequency of footpath

use was provided by Morrison, whose lot has been in his family since "[a]bout 1947." He testified that the historical access had been "[g]enerally by boat, and in the spring or bad weather when the ice is either coming in or going out, we might go through the woods." He described the woods as "so thick and the walking . . . so tough . . . [that the campers] all had a more or less of an emergency right-of-way out, but there . . . very certainly wasn't any good paths out." On the evidence, therefore, access by boat was the more "reasonably convenient and suitable way," *id.* at 522, to the landlocked lots, and we find no error in the trial court's determination that the original deeds granted such access.

 We also find no error in the trial court's implicit determination that in 1973, the owners of the dominant and servient estates mutually relocated the easement granted in the original deeds. Specifically, the trial court found: (1) that "Harold Brown[] created [the] planned fifty-foot right-of-way, with the effect of swapping it for the Sandy Beach access point, which the campers historically used"; and (2) that "[t]he campers used this right-of-way for over thirty years without issue." Again, the law and the record support the court's findings and rulings. We have recognized that where the location of a deeded right of way is uncertain, it may be clarified by the agreement of subsequent owners. *See Donaghey v. Croteau*, 119 N.H. 320, 324 (1979). We have also noted:

> When a deeded right-of-way is obstructed or impaired by the conduct of the owner of the servient estate, the owner of the dominant estate may deviate from the deeded right-of-way in order to preserve the right granted as long as the proposed deviation is not unduly burdensome to the servient estate.

*Flanagan*, 138 N.H. at 573.

██ ██ Walsh testified that when he filed an appearance in the probate estate of Harold Brown because he "got worried about the right-of-way," Ethelyn Brown assured him that "Harold ha[d] set a right-of-way for the use . . . of cottage owners, and she brought in a plan that day," presumably the 1971 subdivision plan. Thus it appears that Harold Brown initially sought to unilaterally change the location of the historical right of way in conjunction with subdividing and selling the Snow and Ringer lots. While Harold Brown could not have effected such a change unilaterally, *see Sakansky v. Wein*, 86 N.H. 337, 340 (1933) (owners of servient estate may not "compel the [owner of the dominant estate] to detour over other land of theirs"), the campers acquiesced in the relocation and, as the trial judge found, with ample support in the evidence, they used the new right-of-way "for over thirty years without issue." *Cf. Donaghey*, 119 N.H. at 324

(continued use of right-of-way "is evidence of the intended location of the way"). Accordingly, we find no error in the trial court's location of the right-of-way.

The respondents next contend that the trial court erred in finding that the petitioner and the campers have an easement over their land because: (1) the petitioner and the campers are strangers to the respondents' chain of title; and (2) the language appearing in their chain of title would grant, at most, a revocable license to specified persons. They argue: "Simply, the [petitioner's] rights over the Subject Parcel are limited to the language of the Deeds in the chain of title to the Subject Parcel, and the language in these deeds speaks only to permission to specified individuals, which is insufficient to create an easement right." The language to which respondents refer is the paragraph that originated in the deed from Ethelyn Brown to Charles E. Brown:

> Some western shore owners (Lower Beach [*sic*] Pond) with limited access to their lots, have been permitted use of this 50 foot wide area in order to reach the Pond from Brown Road (Lawrence Walsh, Ruth Mills, Trygve Amundsen and Messrs, Sokolov and Earle).

The respondents' arguments rest upon the premise that the petitioners and the campers are strangers in title to the respondents' lot because "[n]one of the [campers or the petitioner] are in the chain of title to the Subject Parcel. Likewise, none of the deeds in the chains of title to the [campers' or the petitioner's] properties mention the Subject Parcel." We concur with the Vermont Supreme Court, which in *Moore v. Center*, 204 A.2d 164, 167 (Vt. 1964), found such a contention "unsound." The defendant in *Moore* argued that he did not have constructive notice of an easement conveyed in a deed "concern[ing] other lands of the common grantors which are outside his chain of title." *Moore*, 204 A.2d at 167. The court rejected that argument as "based on the erroneous notion that since the title to the fee of the dominant estate is not part of the defendant's tract, the easement created in favor of that estate is outside the defendant's line." *Id.* It then explained that "[t]he grantors of the plaintiffs' easement were not strangers to the defendant's title[ where] . . . one of the grantors of the right[] was the defendant's immediate predecessor in the servient estate." *Id.*

Similarly, here, title to the petitioner's, the campers' and the respondents' lots can all be traced back to a common owner, Charles H. Brown. The trial court found that the easement rights now held by the petitioner were conveyed in the 1927 and 1930 deeds from Charles H. Brown to the petitioner's predecessor in title, Robert Craig. The respondents' title to the fifty-foot strip can be traced back to the passage of title

to Charles H. Brown's property to his widow after his death in 1951, and her conveyance of the property containing the fifty-foot strip to Harold Brown in 1961. As we recently explained in *Soukup v. Brooks*, 159 N.H. 9, 20-21 (2009), running the grantor index for Charles H. Brown from the date he acquired the larger parcel through the time the parcel containing the respondents' lot was conveyed out would have revealed the grant of the easement at issue. Although the terms of the easement are admittedly ambiguous, the 1927 and 1930 deeds provided constructive notice of the easement and imposed a duty upon the respondents to make inquiry as to its location. *See Amoskeag Bank v. Chagnon*, 133 N.H. 11, 14, 15 (1990). We further note that as the petitioner's rights originate in the 1927 and 1930 deeds, the 1987 deed from Ethelyn to Charles E. Brown is irrelevant and we need not determine whether the petitioner is a stranger to that deed or the nature of the rights or licenses, if any, it may grant to the individuals named therein.

▮ The respondents next argue that the trial court improperly expanded any easement granted in the original deeds beyond a reasonable use. "In determining permissible use of an easement, courts are guided by the principle of 'reasonable use.' " *Boston & Me. Corp. v. Sprague Energy Corp.*, 151 N.H. 513, 519 (2004). The determination of whether the use of an easement is a reasonable use is a question of fact for the trial court and "[w]e will not overturn the factual findings of the trial court when they are supported by the evidence." *Id.* (quotation and ellipsis omitted).

▮ "An enlargement of use is permissible if the change of a use is a normal development from conditions existing at the time of the grant, such as an increased volume of traffic." *Id.* (quotation omitted). The easement holder cannot, however, "materially increase the burden of it upon the servient estate, nor impose a new or additional burden thereon." *Id.* (quotation omitted). "The test to determine the right to make a particular alteration is whether the alteration is so substantial as to result in the creation and substitution of a different servitude from that which previously existed." *Id.* (quotation omitted).

The respondents argue that "the change of use from a wooded footpath to [a] (differently located) parking lot, boat trailer storage, and boat pier is not a simple 'increased volume of traffic' or 'normal development from conditions existing at the time of the grant.' " (Quoting *Boston & Me. Corp.*, 151 N.H. at 519.) Again, the respondents' argument rests upon the faulty premise that the original easement granted in the 1927 and 1930 deeds was solely the pedestrian footpath through the woods. The trial court found, however, that the petitioner and the campers had historically accessed their

lots *both* by an overland footpath and by boat from Sandy Beach. As discussed above, there is ample support in the record for that finding.

 Moreover, while the campers improved the fifty-foot strip with a gravel driveway, parking area and dock, the evidence indicates that the nature of the use did not substantially change. For instance, although Walsh testified that he did not maintain a dock on Sandy Beach, he did leave his boat on the beach. In addition, as the intended use of the easement has always been to provide access *from the road* to the shore so that the petitioner's family and the campers could get to their lots by boat, the parking of vehicles nearby implicitly has always been connected to use of the right-of-way. Accordingly, we cannot conclude that constructing the dock and improving the fifty-foot strip to accommodate off-road parking was "so substantial as to result in the creation and substitution of a different servitude from that which previously existed." *Id.* (quotation. omitted).

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.